FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHWESTERN DIVISION

01 SEP 28 PM 1: 33

U.S. DISTRICT COURT
N.D. OF ALABAMA

TRI-CITIES MANUFACTURING, INC.,     )
and EATON TECHNOLOGIES, INC.,       )
d/b/a/ FASCO DC MOTORS DIVISION,    )
                                    )
    Plaintiffs,                    )
                                    )
v.                                  )    CASE NO. CV-99-B-0254-NW
                                    )
PHILLIPS CHEMICAL COMPANY,          )
INC., and PHILLIPS PETROLEUM        )
COMPANY, INC.,                      )
                                    )
    Defendants.                    )

**ENTERED**

SEP 2 8 2001

## MEMORANDUM OPINION

Currently before the Court is the Motion for Summary Judgment filed by defendant

Phillips Petroleum Company (hereinafter "defendant" or "Phillips").[1]  In this lawsuit, plaintiffs

Tri-Cities Manufacturing, Inc. ("TCM") and Eaton Technologies, Inc. d/b/a FASCO DC Motors

Division ("FASCO") (collectively "plaintiffs"), claim that Phillips committed fraudulent

suppression, fraudulent misrepresentation, wantonness, negligence, breach of contract, and

breach of warranty in connection with Phillips' sale to TCM of raw materials used by TCM in

molding a plastic automotive part sold to FASCO for incorporation into an anti-lock braking

system motor.  Plaintiffs concede that summary judgment is due to be granted on their

misrepresentation and breach of warranty claims (Counts 3 and 6, respectively).  (Plaintiff's

Response in Opposition to Phillip's Motion for Summary Judgment ("Pls.' Brief") at 10.)  Upon

consideration of the evidence, the submissions of the parties, the arguments of counsel, and the

---

[1] In its Answer filed March 4, 1999, defendant Phillips Petroleum Company, Inc. answered
the Complaint on its own behalf and on behalf of its division, defendant Phillips Chemical Company.

relevant law, the court is of the opinion that defendant's Motion is due to be granted on each of the remaining claims.[2]

## I. FACTUAL SUMMARY

This case involves four tiers of the automotive industry: Ford, the end user, represents tier one; Kelsey-Hayes, Ford's supplier, represents tier two; FASCO, Kelsey-Hayes supplier, represents tier three; and TCM, FASCO's supplier, represents tier four.  (PX III 54 at 23-25.)[3] Plaintiff TCM, located in Tuscumbia, Alabama, manufactures and molds, among other things, plastic parts used in the manufacture and assembly of automobiles.  (DX I 1 at ¶¶ 1 & 7.)[4] Plaintiff FASCO conducts  business in Eaton Rapids, Michigan, manufacturing and assembling DC motors for use in automobiles.  (DX I 1 at ¶¶ 2 & 8.)  On or before October 15, 1993, TCM

---

[2]  At the conclusion of oral argument, the court informed the parties of its intention to grant summary judgment in favor of defendants.  The court requested that counsel for defendants prepare a proposed memorandum opinion for the court and required that counsel send a copy of the proposed opinion to counsel for the plaintiffs.  Although the court has made some changes to the opinion prepared by defendants' counsel, it has adopted a large part of the proposed opinion.  The court is aware of the admonition of the Eleventh Circuit that district courts not delegate "the task of drafting important opinions to litigants."  *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1373  n.46 (11th Cir. 1997).  This is an important opinion and the court had reached a firm decision as to the appropriate outcome before requesting a proposed opinion from defendants' counsel.  In this case defendants' counsel drafted the opinion according to the express instructions of the court as to its contents.  These instructions were stated to defendants' counsel, with plaintiff's counsel present, following oral argument.

[3]  Plaintiffs submitted Notice of Filing Evidentiary Submission in Support of Plaintiffs' Response in Opposition to Phillip's Motion for Summary Judgment Volumes I, II, and III, with attached exhibits.  References to this evidence will be cited as "PX I," "PX II," and  "PX III," followed by the corresponding exhibit number.

[4]  Defendant filed Notice of Filing Evidentiary Submission in Support of Defendant Phillips Petroleum Company's Motion for Summary Judgment Volume I, with attached exhibits.  References to this evidence will be cited as "DX I," "DX II," and "DX III," followed by the corresponding exhibit number.

and FASCO entered into a "partnership, joint venture or agency relationship to engage in research, development and design of a plastic End Frame part to be used on the anti-lock braking system ("ABS") motor which was manufactured and assembled by FASCO." (DX I 1 at ¶ 9.)[5]

Among other business activities, Phillips sells resins that are used by its customers as raw materials in the manufacture of other products. (Def.'s Brief at 1.) One resin is sold under the name Ryton® PPS (polyphenylene sulfide). (DX II 58.) Defendant markets the Ryton® PPS as resins that are distinguished by high temperature performance and dimensional stability in the fully crystalline form. (DX II 58 at 2.) R-4XT and R-7 are examples of plastic resins sold by Phillips as part of the Ryton line. (DX II 58 at RFD00011547 & RFD00011605.)

Mark Goydich[6] ("Goydich") served as the Ryton account manager for the territory that includes TCM. (DX I 9 at 31.) By letters dated January 26, 1990, January 30, 1990, and September 8, 1993, at Goydich's request, Phillips sent product literature to TCM that included,

---

[5] At the hearing on October 10, 2000, plaintiffs disclaimed the existence of a partnership relationship, and plaintiffs' letter brief of October 12, 2000, expressly stated that plaintiffs were not in a partnership or joint venture relationship. (Tri-Cities Manufacturing, Inc. et al., v. Phillips Chemical Company, Inc., et. al. Case No: CV-9-B-0254-NW LETTER BRIEF ON DUTY ("Pls.' Letter Brief") at 2.) "The test to be applied in determining whether there existed an agency relationship based on actual authority, is whether the alleged principal exercised a right of control over the manner of the alleged agents performance. Control must be proven; and proof of control requires more than proof of a mere right to determine if the person claimed to be an agent is conforming to the requirements of a contract." *Malmberg v. American Honda Motor Co., Inc.*, 644 So. 2d 888, 890 (Ala. 1994). No evidence has been presented by either plaintiff or defendant that FASCO had control over TCM or that TCM had control over FASCO that would rise to the level of an agency relationship. Therefore, the court finds that FASCO and TCM did not enter into an agency relationship.

[6] The following are current or former Phillips employees: Mark Goydich, Greg Davis, Nate Harry, Robert Wareham, Rick Kunc, Thomas Giovannetti, Jon Ratzlaff, and Randy Hagenson. The following are current or former TCM employees: Don Sharp, Tom Brandon, Mitch Whitted, Tim Mansell, and Dean Solon. The Following are current or former FASCO employees: Bob Bartell, David Raloff, Pat Cusack, and Bill Kirchmeier.

among other things, a Ryton Processing Guide, a Ryton Design Guide, a Ryton Corrosion

Resistance Guide, a Ryton Engineering Properties Guide, a Ryton PPS Engineering Properties

Guide, and a Ryton Trouble Shooting Chart.  (DX II 83; DX II 84; DX II 85; DX II 58.)  Included

within the Ryton literature were key recommendations and warnings about use of the Ryton line

of plastics.  (*See* DX II 58.)  By way of example, the Design Guide notes, at page 6,

> [w]ith Ryton PPS, as with all resins, it is important to strive for uniform wall
> thickness.  When this is impractical, parts should be designed to fill from thick to
> thin areas.  Uniform wall thickness is also desirable to minimize internal stresses.
>           Wall thickness variations can affect the direction of material flow and therefore
> shrinkage.
>           . . .
>           In very thick sections, the surface stops shrinking as it solidifies while the interior
> bulk continues cooling and shrinking.  **The difference in shrinking can pull the
> material apart leaving sink marks and shrink voids which reduce overall strength.**

(DX II 58 at RFD00011607) (emphasis added.)

The Design Guide further notes that radical variations in wall thickness tend to

concentrate both internally and externally-applied stresses, and that unavoidable variations in

wall thickness should be made gradually to minimize stress concentration.  (DX II 58 at

RFD00011609.)  The Design Guide also states that weld lines, formed when the melt flow

divides and then reunites, can reduce mechanical strength and, if possible, should be eliminated

or located in areas with lower load requirements.  (DX II 58 at RFD00011608.)  To enhance weld

line strength, the Guide stresses thorough packing of the part.  (DX II 58 at RFD00011608.)  The

Design Guide further discloses that Ryton compounds, like other engineering plastics, are notch

sensitive or susceptible to stress concentrations at corners.  (DX II 58 at RFD00011609.)  The

Guide states that because the compound is notch sensitive, sharp corners should be avoided in

part designs.  (DX II 58 at RFD00011609.)

-4-

The Design Guide also notes that "[m]old design is as critical as part design," and that "[a] well planned mold will control the effects of gate location and melt flow paths on shrinkage, warpage, and part strength." (DX II 58 at RFD00011613.) It is noted that "[m]old temperature significantly affects crystallinity and thus the long term dimensional stability of the part . . . ." (DX II 58 at RFD00011613.) The Design Guide also stresses that, "[t]o successfully mold Ryton PPS compounds proper venting is essential." (DX II 58 at RFD00011616.) "Poor or improper venting results in hard to fill parts and burning of the part in areas where gas is trapped." (DX II 58 at RFD00011616.) The Processing Guide specifically advises, at page five:

> To insure proper packing, both injection pressure and rate should be the maximum possible without flashing the mold. The amount of molten plastic packed into the cavity can affect the physical characteristics of the material. **Substantially underpacked parts may exhibit poor mechanical strength.**
> **. . .Well-packed parts, molded with higher injection pressures have consistent part weight and surface finish, with fewer voids, less warpage and lower shrinkage.** For this reason it is recommended that Ryton PPS compounds be molded at the maximum pressure that will not flash the mold. Maximum injection pressure will also insure part to part uniformity and better dimensional stability.

(DX II 58 at RFD00011517) (emphasis added.)

In early 1993, Goydich asked Phillips technical services representative Robert Wareham ("Wareham") for comments about the design of TCM's new plastic endframe part. (DX II 73.) On February 11, 1993, Wareham discussed his views with TCM employee Don Sharp ("Sharp") by telephone. (PX III 59 at 355-56; DX II 73.) Among other things, Goydich asked about wall thickness and weld lines. (PX I 9.)

Rick Kunc ("Kunc"), a Phillips employee, and Wareham reviewed the TCM concept drawing for the Motor Endcap/Brushcard Assembly and gave Goydich their initial

recommendations in a letter dated September 22, 1993. (DX II 63.)  The reviewed design was substantially different from the design that ultimately went into production; i.e., the endframe and brushcard at this point in time were contemplated to be a single molded part, but they were later separated. (DX I 3 at 220-21.)

Beginning in 1993, TCM received shipments of R-7 and later, R-4XT, for use with the endframe project. (DX II 90 at ¶ 4.)[7]  Throughout 1993, 1994, and 1995, samples were sent free of charge or with special pricing. (DX II 90 at ¶¶ 5-7.)  Each shipment was accompanied by a Phillips purchase order acknowledgment form. (DX II 90 at ¶¶ 5-8, Ex. A, B, C.)  On the reverse of the acknowledgments appear Phillips' terms and conditions of sale, including without limitation, a disclaimer of implied warranties, a contractual limitations period for the commencement of actions, and a contractual limitation of damages. (DX II 90 at ¶ 4 & Exs. A-D.)  Goydich stated that, to his knowledge, Phillips was never notified by TCM of any disagreement with, or refusal to accept, Phillips' standard terms and conditions of sale. (DX II 90 at ¶ 4.)

In an undated letter, TCM employee Mitch Whitted ("Whitted"), at the request of Goydich, sent Wareham parts because TCM was having problems obtaining dimensional concentricity. (DX II 68.)  On September 15, 1994, and September 19, 1994, Goydich responded to Whitted's letter with certain recommendations, including an increase in the size of the

---

[7]  Both Volume II and Volume III of Notice of Filing Evidentiary Submission In Support of Defendant Phillips Petroleum Company's Motion for Summary Judgment contain an exhibit tab number "90."  The court will refer to each as tab number 90, but will differentiate between the two by the Volume number, thus, "DX II 90" and "DX III 90."

diaphragm gate; an increase in cooling time; an increase in holding time; and an increase in packing pressure to the extent possible without "flashing."[8]  (DX II 67 & 69.)

Although Phillips initially recommended that R-4XT be used for the endframe project, (DX II 73), tests were also done to see if R-7, a weaker, but less expensive, material would work. (DX I 15 at 115-17.)  However, early molding done in the one-cavity prototype mold with the R-7 produced endframes that failed.  (DX I 18 at 190-91.)  TCM then began sampling the R-4XT, as well as other non-Phillips plastics, including Amoco's Amodel and custom-created compounds.  (DX I 21; DX I 23; DX I 24; DX I 25; and DX I 15 at 232-33.)  Amoco performed a computer modeling analysis of the part and shared its results with FASCO and TCM on July 1, 1994.  (DX I 22.)  Based on its analysis, Amoco "highly recommend[ed] to sandwich the end plate between metal pieces."  (DX I 22.)  TCM and FASCO decided not change the part design because it would have increased the cost of the part.  (DX I 18.)  TCM did not share the Amoco work with Phillips.

In January 1996, Phillips reviewed TCM's mold design drawing.  (DX II 70.)  Wareham made comments on the design and TCM employee Tim Mansell ("Mansell") made design changes based on those recommendations.  (DX II 70 & 71.)  Both Sharp and Mansell acknowledged that they generally agreed with the comments made by Phillips personnel regarding the part and the mold design, that the suggestions were general in nature and nothing out of the ordinary, and that if they had disagreed with a Phillips recommendation, they would

--------

[8] "Flash" occurs when the molten material seeps between the parting lines of the mold.  (DX I 17 at 85.)

not have followed it. (DX I 15 at 176-77, 448, 601-03; DX I 12 at 114-15, 252-53; DX I 16 at

188.)

Although both TCM (primarily Sharp) and FASCO (primarily Bob Bartell ("Bartell") and

Ralph Witgen ("Witgen")) were involved in designing the endframe, FASCO had the last word

on design issues, and the final part drawing carried a FASCO title block. (DX I 18 at 41; DX I

15 at 140-41, 183-85; DX I 12 at 109-110.) Phillips made no review of the final part design, nor

was Phillips asked to do so. (DX I 3 at 217-19) In the spring of 1996, TCM and FASCO

changed the part design to add ramp ribs to keep a metal cap from slipping off the endframe

during assembly. (DX I 15 at 392-96.) Phillips was not asked to review or comment on the

addition of the ribs. (DX I 18 at 368.)

On or about June 11, 1996, Wareham, at the request of TCM, attended a mold trial at

TCM. (DX II 64.) TCM was working with the four cavity production mold and was

experiencing difficulty with dimensional stability, consistently producing parts having the same

dimensions. (DX II 64.) While at the facility, Wareham made certain observations about

deficiencies in the TCM molding equipment. (DX II 64.) Specifically, Wareham intended to run

a "designed experiment," wherein various pressures and times are systematically varied in an

attempt to improve part quality. (DX II 64.) However, as noted in his report, Wareham was

hampered by equipment limitations:

> [a]lthough this mold trial went fairly well as far as being able to mold parts, it was
> frustrating because of the equipment limitations this company puts on itself. . . .
> [A]fter evaluating the equipment and the factors, it was decided that we could
> really only vary one factor and that was hold pressure. The boost pressure and
> injection pressure were already maxed out. . . . Therefore, the hold pressure was
> varied between 800 and 1000 psig. Unfortunately, the 1000 psig upper limit was
> imposed by the machine. We couldn't get it to turn up any higher.

-8-

(DX II 64 at 1.) Wareham further noted that "[t]he mold temperature was a problem at this trial," with wide fluctuations in temperature among the various mold parts. (DX II 64 at 2.) Also, the hot sprue bushing was observed to have inappropriate temperature extremes, including a portion of the nozzle that was unheated and "would occasionally freeze off." (DX II 64 at 2.) "Before leaving [Wareham] strongly recommended that [TCM] investigate improving their machine instrumentation and maintenance." (DX II 64 at 2.)

Wareham brought back parts from this mold trial to the Phillips Plastics Technical Center and cut them open to check for internal voids. (DX II 64 at 2; DX II 65.) On June 21, 1996, Wareham wrote Willson, TCM's process engineer, explaining how he cut the parts open and advising that the parts he checked showed the presence of shrinkage voids. (DX II 65 at 1.) Wareham stated:

> Voids from injection molding are typically vacuum voids, created from the shrinkage of material. After the cavity is filled and packed, while the plastic is cooling, the molecules move closer together. If there are not enough molecules of plastic in the cavity, then the molecules pull apart, creating voids. With Ryton PPS the outer skin of the walls cool and solidify quickly, minimizing sinks from material shrinkage. Instead of sinks, though, voids form in the center of the wall thickness, since it is the last area to cool. The solution then is to get more molecules of plastic into the part before the gate freezes off.

(DX II 65 at 2.) Wareham recommended specific processing changes that TCM could try to improve part quality, although he noted it would be difficult given the existing TCM equipment. (DX II 65 at 2.) Wareham advised that, if the processing changes he recommended were not successful in eliminating the voids and achieving dimensional stability, it might be necessary to enlarge the gate and runner size. (DX II 65 at 2.)

-9-

TCM employee Sharp acknowledged that most plastics with any thickness will likely contain voids, (DX I 15 at 436-7), and another TCM employee, Mansell, admitted that TCM knew the voids should be eliminated, (DX I 12 at 146).  Indeed, three TCM technical employees acknowledged that voids are common in the molding of plastics and should be eliminated.  (DX I 15 at 436-37; DX I 12 at 146; DX III 91 at 131.)  Tom Brandon ("Brandon") noted that in "[m]olding, you're going to have voids.  It's the nature of plastic."  (DX III 91 at 131.)  He further acknowledged that, as a matter of common sense, if there is a hole in a plastic molded part, the part is potentially not as strong as it would be absent the hole.  (DX III 91 at 131.)  FASCO's quality assurance manager, David Raloff ("Raloff"), testified that voids in an injection-molded part would cause him to have concerns about the strength or mechanical integrity of the part.  (DX III 98 at 40-41.)  Mansell and Brandon both testified that they were aware of, and had access to, the Phillips technical literature, (DX III 97 at 116-17; DX III 91 at 18-20), and Mansell acknowledged that, had he had additional questions, he could have called the toll-free number provided in the literature for clarification or further assistance, (DX III 97 at 117).[9]

Mansell sectioned parts as recommended by Wareham to look for voids, which were evident in the parts.  (DX I 12 at 143-44.)  Other TCM employees were familiar with the process and participated, at times, in sectioning parts.  (DX I 12 at 176-77.)  Mansell noted, however, that despite TCM's knowledge of the existence of voids in the parts, TCM did not, during the term of his employment through the fall of 1996, institute any regular procedure requiring the sectioning or inspection of parts on a routine basis during production.  (DX I 12 at 145-46.)  TCM also did

---

[9] The Phillips technical literature discusses the impact that voids in an improperly molded part can have on, among other things, part strength.  (DX II 58 at RFD00011607.)

not weigh molded parts, as Wareham advised, which would have indicated underpacked parts and the potential for voids. (DX II 58 at RFD00011517; DX II 75 at 2; DX I 4 at 46.)

In or around the fall of 1996, when TCM was about to take the plastic endframe into full production, TCM employees Sharp, Mansell, Willson, and Dean Solon ("Solon"), all of whom had been heavily involved in the project, left their employment at TCM. (DX I 15 at 492-95; DX I 12 at 148.) FASCO observed a serious decline in TCM's performance after their departure, including a lack of cooperation from management, a failure of TCM to follow suggestions, technical deficiencies in the parts and processing, and "horrible" departures from agreed upon delivery schedules. (DX I 2 at 36-37.) FASCO also found that the problems were recurrent, leading FASCO ultimately to question whether TCM was competent to do the work. (DX I 2 at 37.)

TCM and Phillips entered into a letter agreement dated October 23, 1996, setting forth the pricing for sales of R-4XT for the term November 1, 1996, through October 31, 1997. (DX II 90 at Ex. E.) The agreement contemplated TCM's purchase of 50,000 to 100,000 kilograms of R-4XT over the one-year period, to commence at or around the time TCM planned to go into full production of the parts. (DX II 90 at Ex. E.) The letter agreement incorporated by reference Phillips' standard terms and conditions as set forth on the reverse side of the purchase order acknowledgment forms that TCM had been receiving since 1993. (DX II 90 at Ex. E at 2.) At no time did Phillips enter into any contract or agreement with FASCO or TCM regarding Phillips' provision of technical services, nor was Phillips ever compensated by TCM or FASCO for any technical assistance provided. (DX I 17 at 345-46.)

-11-

Throughout the fall of 1996, TCM was receiving increased pressure from FASCO to commence production of the plastic endframes. (DX I 6 at 83-84, 120-121, 202-03.) In November 1996, among other problems, TCM was experiencing surface discoloration on the endframes. (DX II 66 at 1.) On November 18, 1996, a conference call was held between TCM employee Brandon, and Phillips employees Goydich and Wareham. (DX II 66 at 1.) Wareham made recommendations to Brandon for improvement in TCM's processing and offered to put the mold on the injection molding equipment at Phillips' Plastics Technical Center to see if he could eliminate the problems TCM was experiencing. (DX II 66 at 1.) Brandon declined Wareham's offer because the mold was needed for production. (DX II 66 at 1.) During the conversation, Wareham again advised Brandon to cross-section the parts. (DX I 4 at 50-51.)

Throughout the period leading up to production, and into the production period, TCM also continued to struggle with inconsistency in the hub diameter of the part. (DX I 18 at 364; DX I 2 at 48-49; DX I 6 at 78, 81.) Ultimately, TCM was forced to agree to inspect one hundred percent of the parts before FASCO would agree to take delivery of the parts. (DX II 37; DX I 12 at 169.) Even after TCM committed to one hundred percent inspection, FASCO continued to receive non-conforming endframes. (DX I 2 at 49-50; DX I 13 at 20-21.) By December 1996, TCM still had not achieved dimensional stability on the key hub diameter dimension. (DX I 18 at 497-98.)

TCM continued to have difficulty meeting the production schedule established with FASCO. (DX I 18 at 502; DX I 11 at 45-47, 63-72, 78.) During this time, FASCO requested more parts from TCM. (DX I 6 at 112-14.) In November, 1996, FASCO concluded that if TCM

-12-

could not improve its production capacity, it would have to find a second source for the endframes. (DX I 27.)

TCM not only molded the endframe for FASCO, it also handled assembly of a plastic brushcard. (DX I 28 at 1.) FASCO experienced numerous problems with the quality of both the molded endframes and the brushcards. (DX II 41; DX II 43.) TCM personnel were required to visit FASCO to discuss the problems, inspect delivered parts, and make assurances about future quality. (DX I 28; DX II 31, 39, 41, 43, 46, 49, 52, 54, 55, 56, 57, 60; DX I 4 at 32, 43-44, 65.)

In January 1997, FASCO advised TCM of problems with the flatness of the endframes. (DX I 29 at 1.) Due to concerns raised by FASCO's customer, Kelsey-Hayes, FASCO initiated an "8-D Root Cause Analysis" regarding the flatness issue, which is an automotive industry term given to an in-depth study of a problem to determine its cause. (DX I 8 at 49; DX I 18 at 506.) Kelsey-Hayes' materials engineer Jeff King ("King") became involved due to the warping issues. At King's prompting, FASCO requested TCM provide it with detailed information about the molding process and the molding equipment. (DX II 30, 31, 53.) Kelsey-Hayes was convinced the molding process caused the warping. (DX I 5 at 23.)

On January 13, 1997, TCM employee, Brandon, asked TCM's Board of Directors to order new equipment to be used in connection with the plastic endframe project, including a new oil heating unit. (DX II 62.) In a memo to the Board of Directors, Brandon noted that the present equipment was at least twenty years old, it leaked, and "its accuracy is questionable to say the least." (DX II 62.) Brandon also noted that without equipment changes there was no way to ensure even flow in all cavities, "which is important for the close tolerances that must be kept on

-13-

the end frame." (DX II 62.) Brandon also discussed in the memo the need for a new hot sprue bushing, which he noted "has had cold slugs in the front and rear since the first run." (DX II 62.)

On February 21, 1997, FASCO advised Phillips that Kelsey-Hayes had discovered a crack in one of the plastic endframes on its assembly line at the Fowlerville plant. (DX II 74.) On that same day, FASCO employees, Bartell and Pat Cusack ("Cusack"), met with Greg Davis ("Davis"), a Phillips employee, to request analytical help with the cracking issues. (DX II 74.) Cracks had been discovered in the endframe on February 14, 1997. (DX II 33 at 1.) After cracks were found on the assembly line in February 1997, FASCO examined other production parts it had received from TCM. Cracks and voids were found in most, if not all, of the parts. (DX I 5 at 47-48; DX II 36.) Prior to this time, no one at FASCO had ever asked Phillips for advice or assistance, but instead had relied on TCM's expertise. (DX I 2 at 64.) FASCO provided Phillips with cracked endframes for analysis. (DX II 74.) In late February 1997, FASCO rejected sixty-nine motors for warping and five for cracking. (DX I 18 at 540; DX I 8 at 120.) FASCO believed the rejection of the sixty-nine motors was a severe problem, that would not be expected at that point in the production. (DX I 8 at 120.) On February 28, 1997, Kelsey-Hayes directed FASCO to stop using the plastic endframe and use only aluminum endframes. (DX II 79.)

Significantly, prior to the discovery of cracks in the endframes in February 1997, at which time FASCO requested Phillips' assistance in evaluating the problem, FASCO had not had any contact with Phillips related to the endframe project. FASCO even memorialized that lack of contact or communication. (DX II 34.) Rather, Phillips maintained a customer relationship with TCM related to the sale of R-4XT, (DX II 90 Ex. E), and TCM maintained a separate customer relationship with FASCO related to the manufacture, assembly, and sale of the endframes and

-14-

brushcards. Bartell, chief engineer at FASCO, testified that FASCO was not relying on Phillips in connection with the endframe project, but was instead relying on TCM. (DX I 2 at 64.) Indeed, FASCO never contacted Phillips or counted on Phillips with regard to any aspect of the endframe project during the period in question, but instead "counted on the expertise of [TCM]." (DX I 2 at 64.)

FASCO was responsible for testing the motors assembled with the plastic endframes for strength, durability, and other factors dictated by the automotive industry. (DX I 15 at 95.) Cracks occurred in prototype parts during the testing, although they were not found at the time. (DX I 18 at 347-48.) Kelsey-Hayes believed the cracks could, and should, have been discovered during the pre-production testing and tear down of the motors. (DX I 5 at 26.) Cracks and voids were visible in the pre-production and production parts without magnification. (DX I 5 at 47-48; DX II 36.) Although they were not discovered because FASCO did not check for voids, voids and cracks were present in the early production endframes shipped to FASCO by TCM in November and December 1996. (DX I 5 at 47-48; DX I 2 at 56-62; DX II 36.) Kelsey-Hayes believed FASCO should have checked the plastic parts for voids, even though it was not an industry-required test, because FASCO was responsible for overall part design and development. (DX I 5 at 238-39.)

On March 3, 1997, a meeting was held at TCM to discuss the quality problems with the endframes. (DX II 75.) Present at the meeting were representatives of TCM, FASCO's quality assurance manager Raloff, Kelsey-Hayes's materials engineer King, and Phillips' Wareham, Goydich, and Nate Harry ("Harry"). (DX II 75.) They assembled to conduct a root cause analysis. (DX II 75.) Raloff's report of the meeting noted that "[TCM's] equipment and process

-15-

parameters [were] not able to produce part [sic] to acceptable Ryton material specs." (DX II 75 at 1.) Specific recommendations were made to improve the part design and processing. (DX II 75.) The sectioning and weighing of parts were recommended after the meeting. (DX II 75 at 2.) Nowhere in this memo was Phillips' conduct or material identified as a potential cause of the cracks. (DX II 75.)

Kelsey-Hayes required FASCO to conduct an "8-D Analysis" to determine the root cause of the cracking. (DX I 5 at 66.) Kelsey-Hayes experts assisted FASCO in the analysis. (DX I 5 at 78.) The 8-D report concluded that the primary root cause was poor molding practices on TCM's part that created inadequate strength in the molded parts, (DX I 5 at 82), and possibly the FASCO crimping process, through which a metal can or shell was pressed onto the plastic endframe by pneumatic crimping tools. (DX I 5 at 83; *see* DX II 33 (FASCO's 8-D Analysis).) In the 8-D Analysis, no one indicated that the material itself was a potential root cause, (DX I 18 at 580), nor did anyone mention or suggest that anything Phillips did or did not do was a potential root cause. (DX I 18 at 581; DX I 8 at 51; DX I 5 at 83-84.) In FASCO's opinion, the cracks were likely a direct result of TCM's molding practices. (DX I 18 at 588; DX I 2 at 110.) FASCO never advised Kelsey-Hayes of any differing determination of root cause. (DX I 5 at 85.) John Cassidy ("Cassidy"), Kelsey-Hayes' chief engineer on the project, testified that if the 8-D Analysis had revealed that the material was the problem FASCO should have included it in the report. (DX I 5 at 85.) Cassidy also stated that if FASCO later changed its mind about the root cause and determined it was Phillips' fault, it should have revised the 8-D and advised Kelsey-Hayes. (DX I 5 at 85.)

-16-

As established through FASCO's own witnesses, TCM's substandard performance in production, assembly, and shipping led to continuing complaints from FASCO throughout the production period. (DX I 2 at 36-37, 84-86; DX III 98 at 16-21.) FASCO called TCM's product delivery efforts "horrible" and their part quality "terrible." (DX I 2 at 36.) In fact, FASCO decided to pull the mold from TCM even before the March 3, 1997, meeting at TCM to which Phillips personnel had been invited by FASCO and Kelsey-Hayes to assess TCM's processing. (DX III 98 at 32-33, 43-46; DX III 100.) At the meeting, Kelsey-Hayes employee, King, independently assessed TCM's capabilities and found TCM unsuitable to mold parts destined for Kelsey-Hayes. (DX III 98 at 47, 51-52.) Phillips personnel believed that FASCO was attempting to use Phillips to place the blame on TCM after the cracks were discovered. (DX III 95 at 117, 125-31; DX III 94 at 276-78.) On March 3, 1997, FASCO pulled the four-cavity production mold from TCM and sent it to Huron Plastics, a Michigan molding shop. (DX II 79.)     On March 6, 1997, Wareham sent a letter to FASCO's Bill Kirchmeier ("Kirchmeier") noting the existence of voids and serpentine cold material with integral voids in the cracked endframes. (DX II 76.) Wareham observed that "[v]oids in a part typically reduce the overall strength of the part because of discontinuities of the molecular structure and fiber reinforcement as well as creating many sharp corners that set up notch sensitive areas. These notch sensitive areas lead to stress concentration points that can propagate cracks when the part is stressed." (DX II 76.) Witgen testified that no one at FASCO was surprised by the statements made in Wareham's letter. (DX I 18 at 562.) Phillips also determined that TCM's production parts were not fully crystalline. (DX II 33 at 5-8.) The degree of crystallinity of R-4XT molds alters mechanical properties, as disclosed in the product literature. (DX II 58 at RFD00011551A-RFD00011551B.)

-17-

Among other things, improper or insufficient heating of the mold can lead to non-crystalline parts. (DX I 3 at 147.) The degree of crystallinity in a part affects dimensional stability. (DX II 58 at RFD00011551A.)

On March 12, 1997, Wareham wrote FASCO employee, Kirchmeier, at Kirchmeier's request, commenting on his March 3, 1997, visit to TCM. (DX II 78.) Based on his observations, Wareham reported that TCM had "limited molding capabilities with the equipment and process they currently utilize." (DX II 78.)

On March 12, 1997, Raloff wrote Cassidy, justifying FASCO's removal of the mold from TCM on March 3, 1997, based on the fact that (1) FASCO had no more need for plastic parts, based on Kelsey-Hayes' requirement that only aluminum be used, (2) the quality of the parts was not acceptable, and (3) FASCO believed TCM was financially unstable and that the mold could be difficult to retrieve later if TCM closed its doors. (DX II 79.) Raloff further noted that Kelsey-Hayes employee King "was able to observe process running and concluded TCM not capable." (DX II 79.)

On March 26, 1997, Phillips and FASCO engineering personnel were present when Huron conducted a mold trial using the prototype mold. (DX II 77.) Although Huron was not able to fully eliminate the voids with the existing mold, Huron was able to produce fully crystalline parts and reduce the number of voids present. (DX II 80 at 1.) Significantly, parts produced by Huron were able to be crimped without cracking when FASCO reduced the pressure on the crimping hammers. (DX II 33 at 4.) After the mold trial, Giovannetti advised Witgen to place additional pillar supports on the mold to allow greater pressure to be used in packing the part, which Phillips believed would decrease the number of voids. (DX II 89.) However, the

-18-

mold was not given additional support or further modified to determine if better parts could be produced. (DX I 12 at 187-90.)

Phillips employee Rick Kunc ("Kunc") performed computer-aided analysis of the part and mold design. (DX II 82.) He issued an initial report dated April 4, 1997, but had to revise his report because incorrect data was provided regarding the loads and support conditions involved in the crimping process. (DX II 82 at FASC007056.) Kunc's final report, issued April 30, 1997, concluded that "the crimp process causes the highest stress adjacent to the slot where the cracks are seen." (DX II 88 at PH00000206.)

Kelsey-Hayes believed that FASCO's crimping process was a potential cause of the cracking. (DX I 5 at 83.) Kelsey-Hayes was concerned about the "stack-up" of forces that resulted from the metal shell being forced onto the ribs of the endframe and whether the crimping tool actually hit the plastic endframe, neither of which could be determined by viewing the crimping operation. (DX I 5 at 40-42.) FASCO could not identify the "stack up" forces that were placed on the endframe during crimping. (DX I 5 at 60-61.) FASCO had not determined these forces during its pre-production testing, and Kelsey-Hayes was critical of FASCO's failure to do so. (DX I 5 at 43.)

Kelsey-Hayes employee, Cassidy, inspected the crimping process after the cracks were discovered and identified two major problems. (DX I 5 at 54-58.) First, the hammer that crimped the shell onto the endframe was much wider than necessary, causing the hammer to unnecessarily strike and deform the plastic endframe. (DX I 5 at 55-56.) Second, the ribs on the endframe were being deformed and sheared off during the process, resulting in plastic debris under the shell that impacted the "stack up" loads. (DX I 5 at 56-58.) When questioned about

-19-

these problems, FASCO indicated that they were not aware of them and did not intend for the hammer to hit the plastic.  (DX I 5 at 56.)  Notably, in May 1997, FASCO was of the opinion that, with a modification of the crimping process, it was still worth trying to produce parts without cracks using R-4XT.  (DX I 18 at 602-03.)  TCM likewise believed that it could produce acceptable parts from R-4XT.  (DX I 6 at 178-79; DX I 4 at 112,122.)

    After the molds were pulled, TCM had no further contact with FASCO until FASCO contacted TCM in the summer of 1998 about joining FASCO in a lawsuit against Phillips.  (DX I 6 at 185-186.)  Although FASCO had not received any new information since the spring of 1997, when the 8-D work was performed, (DX I 8 at 89-90), FASCO told TCM that FASCO now believed Phillips was responsible for the parts failure.  (DX I 8 at 97.)  James P. Doyle ("Doyle") suggested to Frank Coseglia ("Coseglia") that TCM join FASCO in the lawsuit and that FASCO would not then pursue claims against TCM.  (DX I 8 at 101.)  TCM and FASCO entered into an agreement regarding the lawsuit in September 1998, (DX II 35), and filed suit on February 3, 1999.  The agreement contained mutual releases, provided that FASCO would bear the litigation expenses and would make any necessary decisions regarding the litigation, and stated that FASCO and TCM would divide any proceeds of the litigation seventy-five percent to twenty-five percent, respectively.  (DX II 35; DX I 6 at 189-190.)

## II. Summary Judgment Standard

    Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c).  The party asking for summary judgment bears the initial burden of showing that no genuine issues exist.  *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H.*

*Kress & Co.*, 398 U.S. 144, 157 (1970).  Once the moving party has met his burden, Rule 56(e)

requires the nonmoving party to go beyond the pleadings and show that there is a genuine issue

for trial.  *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986).  A dispute is genuine "if the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgement, the judge's function is not to "weigh the

evidence and determine the truth of the matter but to determine whether there is a genuine issue

for trial." *Id.* at 249.  Credibility determinations, the weighing of evidence, and the drawing of

inferences from the facts are left to the jury, and therefore the evidence of the nonmovant is to be

believed and all justifiable inferences are to be drawn in his favor.  *See id.* at 255.  Nevertheless,

the nonmovant need not be given the benefit of every inference but only of every *reasonable*

inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

### III. Discussion

**A.    Plaintiffs' Claims Are Barred by the Applicable Statute of Limitations.**

Plaintiffs' Complaint was filed outside the allowable statutory periods and cannot support

any recovery by plaintiffs.  Each of plaintiffs' four remaining claims is time-barred, and summary

judgment is due to be granted in favor of Phillips.

**1.     *The fraudulent suppression claim is time-barred.***

Plaintiffs claim that Phillips fraudulently suppressed the fact that R-4XT produced

excessive outgassing that would result in the formation of voids, and that voids would destroy the

strength of the endframes.  (DX I 1 at ¶¶27-29.)  In order to establish a claim for fraudulent

suppression, plaintiffs must establish (1) that defendant had a duty to disclose a material fact, (2)

-21-

that defendant concealed or failed to disclose this material fact, (3) that defendant's concealment or failure to disclose this material fact induced plaintiffs to act or to refrain from acting, and (4) that plaintiff suffered actual damage as a proximate result. *Locklear Dodge City, Inc. v. Kimbrell,* 703 So. 2d 303, 305 (Ala. 1997). Under Alabama law, a claim for fraudulent suppression is subject to a two-year statute of limitations that begins to run when the plaintiff discovers or should have discovered the alleged fraud. *See* ALA. CODE §§ 6-2-38(l), 6-2-3; *Ex parte American General Finance, Inc.*, 2000 WL 1763362 at *3 (Ala. Dec. 1, 2000); *Life Insurance Co. of Georgia v. Smith*, 719 So. 2d 797, 802 (Ala. 1998). Based on the evidence before the court, the court finds as a matter of law that plaintiffs asserted their suppression claim more than two years after they actually acquired facts that would put a reasonable person on notice of the alleged fraud.[10]

Under Alabama Code § 6-2-3 the start of the running of the two-year limitation period is tolled until the plaintiff discovers facts constituting the fraud. ALA. CODE § 6-2-3. The plaintiff bears the burden of establishing that the tolling provisions of Alabama Code § 6-2-3 apply. *Ex parte Seabol*, 2000 WL 1234626 at *3 (Ala. Sept. 1, 2000); *Leighton Avenue Office Plaza, Ltd. v. Campbell*, 584 So. 2d 1340, 1344 (Ala. 1991). Although the question of when a party should have discovered the fraud is generally a jury question, the court may decide as a matter of law that a party should have discovered the fraud if the party actually knew of facts that would put a reasonable person on notice of the fraud. *Ex parte American General*, 2000 WL 1763362 at *3 (citing *Kelly v. Connecticut Life Ins. Co.*, 628 So. 2d 454, 458 (Ala. 1993)); *see also Smith*, 719 So. 2d at 802 (A party should have discovered fraud upon learning facts that would provoke

---

[10] Plaintiffs' Complaint was filed on February 3, 1999.

inquiry by a reasonable person that would lead to discovery of the fraud.); *Fabre v. State Farm Mut. Auto Ins. Co.*, 624 So. 2d 167, 168 (Ala. 1993). Thus, "it is the knowledge of such facts that would have alerted a reasonable person to the existence of a potential fraud, and not actual knowledge of the fraud itself, that determines whether the question of the tolling of the limitations period in a fraud case can be decided as a matter of law." *Ex parte American General*, 2000 WL 1763362 at *3 (quoting *McGowan v. Chrysler Corp.*, 631 So. 2d 842, 845 (Ala. 1993)). Moreover, fraud is discoverable as a matter of law for statute of limitations purposes when one receives documents reasonably sufficient to put one on notice of fraud. *See Ex parte American General*, 2000 WL 1763362 at *3; *Kelly*, 628 So. 2d at 458 (citing *Hickox v. Stover*, 551 So. 2d 259, 262 (Ala. 1989)); *see also Jackson v. Secor Bank*, 646 So. 2d 1377, 1379 (Ala. 1994) (affirming summary judgment on statute of limitations grounds and holding that plaintiff received documents reasonably sufficient to place one on notice of potential fraud); *Gray v. Liberty Nat'l Life Ins. Co.*, 623 So. 2d 1156, 1159 (Ala. 1993) (same); *Fabre*, 624 So. 2d at 169 (same).

### a. TCM was on notice of the alleged fraud before February 1997.

Assuming TCM could establish each element necessary to support its fraudulent suppression claim, the claim nevertheless fails.[11] TCM's actual knowledge regarding voids would have put a reasonable person on notice of Phillips' alleged fraud before February 3, 1997, more than two years before this case was filed. Upon receiving Phillips' Ryton technical literature in 1990 and 1993, (DX II 85; DX II 86), TCM was placed on notice that improper

---

[11] As discussed below, the court concludes that even if the statute of limitations did not bar plaintiffs' fraudulent suppression claim, defendant is entitled to judgment on the merits.

molding procedures and techniques could result in voids, reducing overall strength, (DX II 58 at RFD00011607). Although plaintiffs assert that Phillips failed to reveal that the strength of the endframes could be compromised because of the voids even if dimensional stability was achieved, plaintiffs concede that, during the June 1996 mold trial, Phillips disclosed the existence of voids in the endframes when TCM was experiencing problems with dimensional stability.[12] (DX I 1 at ¶29.) The deposition testimony of Sharp and Mansell, former TCM employees, and TCM employee Brandon, each of whom were integrally involved in the project, underscores TCM's awareness of the likely existence of voids and of the potential problems associated with voids in a plastic part. Mansell acknowledged that voids were something TCM wanted to eliminate. (DX I 12 at 146.) Sharp, for example, testified as follows:

> Q:    In your experience in injection molding, had you encountered the issue of voids before [June 1996]?
>
> A:    Most plastics that has [sic] any thickness to it most likely will have a void. It's the nature of the beast. . . . A clear material, you could mold it, lay it on the table and watch the bubbles grow.
>         . . . .
>        But most thicknesses of material will have it. That's awfully, awfully hard not to get some.

(DX I 15 at 436-37.) Specifically regarding the existence of voids in the endframes, Mansell testified:

> Q:    Okay. And I would assume from the content of Mr. Wareham's [June 21, 1996] letter and from your discussion about how you had previously

---

[12] Contrary to plaintiffs' contention, in Wareham's June 21, 1996, letter to TCM's Willson, Phillips made suggestions for "improvements in eliminating voids and stabilizing dimensions." (DX II 65 at 2) (emphasis added.) Despite plaintiffs' assertion that Phillips led TCM to believe that voids would not be problematic once dimensional stability was obtained, Wareham's letter clearly differentiates between the elimination of voids and obtaining dimensional stability.

sectioned parts and how you section parts here that ya'll understood that voids were something you wanted to eliminate?

A:      Yeah, yeah.

(DX I 12 at 146.)  Brandon noted that in "[m]olding, you're going to have voids.  It's the nature of plastic," and further acknowledged that, as a matter of common sense, if there is a hole in a plastic molded part, the part is potentially not as strong as it would be absent the hole.  (DX III 91 at 131.)  Bartell, the former FASCO employee who was the chief engineer on the ABS project, testified that knowledge of the existence of voids in the endframes should have alerted TCM to potential problems with the part:

Q:      If you had been told in June of 1996 by [TCM,] and I recognize you're not an injection molder or a plastic expert.  But if you had been told that there were voids in the parts, the plastic parts that were being shipped to you, would that have concerned you?

A:      Oh, absolutely.

Q:      Would you have taken some steps to look to see the level of them and what effect it would have on them?

A:      I certainly would like to think that I would have, yes.
            . . . .
Q:      There has been some testimony in this case that what [TCM] understood the [June 21, 1996] letter [from Wareham] to mean was that as long as they could get dimensional stability or conformity, that the voids were not a problem.  That was not your reading of the letter?

A:      No.

Q:      Okay.

A:      Somebody testified that voids were not a problem as long as the parts were dimensionally correct?

Q:      Yes.

A:     That's surprising.

Q:     You would not agree with that?

A:     No. Not under any conditions.

(DX III 90 at 72-75.)

As early as 1990, Phillips informed TCM through the Ryton technical literature not only about the possible existence of voids in a plastic part, but also about the problems they could cause, including a potential compromise of part strength. (*See* DX II 58 at RFD00011607.) Mansell and Brandon both testified that they were aware of, and had access to, the Phillips technical literature that discussed the impact that voids in an improperly molded part can have on, among other things, part strength, (DX III 97 at 116-17; DX III 91 at 18-20), and Mansell acknowledged that, had he had additional questions, he could have called the toll-free number provided in the literature for clarification or further assistance. (DX III 97 at 117.) As noted previously, Sharp and Mansell both testified that, prior to the mold trial in June 1996, TCM knew that voids occurred in plastic parts and that voids might contribute to problems in the endframes. (DX I 15 at 436-37; DX I 12 at 146.) Mansell also testified that TCM's personnel sectioned parts as Wareham's June 21, 1996, letter recommended, and that he observed voids in the endframes. (DX I 12 at 143-45.) Bartell's testimony also demonstrates that a prudent molder should have been concerned about the voids in June 1996. (DX III 90 at 72-75.)

The evidence is also undisputed that Phillips advised TCM in the technical literature of the importance, in molding the R-4XT, of maintaining the desired temperature uniformly through the mold. (DX II 58 at RFD00011613 & RFD00011518.) The evidence reveals that TCM's molding equipment, including the heating elements, was old and unreliable, and that TCM knew

-26-

it was at risk of producing non-crystalline parts. (*See* DX II 62.)  At the June 1996 mold trial,

Wareham observed critical variances in the mold temperature and advised TCM that it needed to

balance the temperatures between the various sections of the mold.  (DX II 64 at FASC010069.)

Wareham stated that the mold trial on June 11, 1996, "was frustrating because of the equipment

limitations [TCM] puts on itself," and recommended before leaving "that [TCM] investigate

improving their machine instrumentation and maintenance."  (DX II 64.)  Seven months later, in

January 1997, TCM employee, Brandon made a request to the TCM Board of Directors for the

purchase of a new oil heating unit to replace the twenty-year-old equipment being used, the

accuracy of which he deemed "questionable to say the least."  (DX II 62.)

As discussed in the previous paragraph, Phillips adequately disclosed to TCM, and

correctly advised TCM, that part quality was directly related to the quality of the molding

equipment used and of the skill of the operators at the mold.  The existence of voids or the

creation of non-crystalline parts were risks that TCM understood and were disclosed to TCM in

Phillips' instructions given at the project's inception in the technical literature and, at the very

latest, through Wareham's assistance and correspondence in June 1996.  (DX I 15 at 436-37; DX

III 91 at 131; DX I 12 at 146; DX II 65; DX II 58 at RFD00011518, RFD00011613.)  TCM's

fraudulent suppression claim is thus barred by the two-year statute of limitations based on its

knowledge of facts well before February 3, 1997, that would provoke inquiry by a reasonable

person leading to discovery of the alleged fraud. *See, e.g., Ex parte American General*, 2000 WL

1763362 at *3; *Jackson*, 646 So. 2d at 1379; *Gray*, 623 So. 2d at 1159; *Kelly*, 628 So. 2d at 458.

-27-

**b.**     **FASCO's fraud claims are similarly barred.**

Phillips is likewise entitled to summary judgment on FASCO's suppression claim. Despite the fact that FASCO did not interact directly with Phillips regarding the endframe project before the cracks were discovered by Kelsey-Hayes in February 1997, (DX II 34), FASCO also had knowledge of facts more than two years before this suit was filed that would have provoked an inquiry by a reasonable person leading to discovery of the alleged fraud.

As an initial matter, TCM and FASCO "entered into a . . . relationship to engage in research, development and design of a plastic End Frame part to be utilized on the anti-lock braking system motor which was manufactured and assembled by FASCO." (DX I 1 at ¶ 9.) By letter agreement sent to FASCO employee, Bartell, on October 15, 1993, signed by FASCO on December 9, 1993, TCM employee, Sharp, "set down the basic understanding of our partnership in the design and development of the [ABS endframes and brush cards] with [FASCO]," and noted that "TCM's intent is to help design this assembly and at the direction of [FASCO], prototype and follow up with production of assembly." (DX III 100; DX III 99 at 572-573.) TCM and FASCO were both involved in designing the part, but FASCO had the final word on the design and the part drawing carried a FASCO title block. (DX I 18 at 41; DX I 15 at 140-41, 183-85; DX I 12 at 109-110.) TCM was responsible for, among other things, interacting with suppliers such as Phillips in order to procure raw material for molding and testing -- that is, prototyping -- the endframe part in different plastics, (DX I 19; 20; 21; 25; 15 at 232-33, 279), and FASCO relied on TCM to provide the technical expertise required for molding the part to its specifications, (DX I 2 at 64). The court will not address whether FASCO had knowledge of

-28-

Phillips' allegedly fraudulent conduct based on a partnership, joint venture, or agency relationship between FASCO and TCM.[13]

After cracks were found by Kelsey-Hayes on the assembly line on February 14, 1997, FASCO examined other production parts it had received from TCM, and found cracks and voids in most, if not all, of the parts. (DX I 2 at 56-62; DX I 5 at 47-48; DX II 36 at FASC010039.) These parts were received in the late fall of 1996, more than two years before the Complaint was filed. (DX I 6 at 120-21; DX I 11 at 64). As evident from Bartell's testimony, FASCO knew that voids in plastic parts were problematic. (DX I 2 at 74-75.) FASCO's quality assurance manager testified that voids in an injection-molded part would cause him to have concerns about the strength or mechanical integrity of the part. (DX III 98 at 40-41.) FASCO had, or should have discerned by prudent examination of the parts,[14] the knowledge or information plaintiffs claim that Phillips suppressed.

Before the cracks were found, FASCO considered TCM's parts to have terrible quality, FASCO was having trouble getting TCM to deliver enough parts, and FASCO was questioning TCM's competence to perform the job. (DX I 2 at 36-37.) FASCO required TCM to inspect one hundred percent of the parts TCM shipped to FASCO for defects, but still received broken parts,

---

[13] It is noteworthy that plaintiffs have not specifically disclaimed the existence of the agency relationship they pled. (DX I 1 at ¶ 9.) However, plaintiffs conceded "that there was not a partnership and/or joint venture relationship between TCM and FASCO," in their letter brief dated October 12, 2000. If the court had determined that an agency, partnership, or joint venture relationship existed between FASCO and TCM, any knowledge TCM had acquired would be imputed to FASCO. *See Crews v. Herman Maisel & Co., Inc.*, 524 So. 2d 980, 982 (Ala. 1988); *Shelter Modular Corp. v. Cardinal Enterprises, Inc.*, 347 So. 2d 1334, 1338 (Ala. 1977); *Williams v. Fundaburk*, 185 So. 383, 384 (Ala. 1938).

[14] Kelsey-Hayes believed that FASCO could, and should, have discovered the cracks during FASCO's pre-production testing and tear down of the motors. (DX I 5 at 26.)

parts with an incorrect hub diameter, and considered TCM's shipments unacceptable because of the number of quality defects. (DX I 2 at 49-50; DX I 13 at 20-21.) FASCO was having so many problems with the parts it was receiving from TCM that it required TCM to come to its plant for a quality review meeting. (DX II 32; DX II 52.) TCM sent out a memo on February 19, 1997, stating that they had "[r]eceived a call from [FASCO's] Quality manager. They have suddenly started seeing cracked and broken endframes. . . . We need to go through our finished parts to check for this damage." (DX II 57.) It was FASCO's job to test the endframes. (DX I 15 at 94-95.) After, the cracks were discovered in the endframes, FASCO examined older parts in their possession and found cracks and voids in those parts as well. (DX I 18 at 347-48; DX I 5 at 47-48.) FASCO had many problems with TCM's work and had parts containing voids and cracks in their position before February 1997. FASCO knew at that time that Phillips had never advised it about any potential problems with the endframes. (DX II 34.) Had FASCO believed Phillips' silence was wrongful, it was required to bring its claim within two years of the time when it should have discovered the basis of the claim, that is, when it should have discovered the voids and cracks in the early production parts, more than two years before this suit was filed.

### 2.   *Plaintiffs' claims for wantonness and negligence are barred by the two-year statute of limitations.*

Plaintiffs' wantonness and negligence claims are also untimely. Both claims are subject to a two-year statute of limitations. *See* ALA. CODE § 6-2-38; *Booker v. United Am. Ins. Co.*, 700 So. 2d 1333, 1339-40 (Ala. 1997). The Alabama Supreme Court has held that the savings provision of ALA. CODE § 6-2-3 does not apply to non-fraud claims. *Booker*, 700 So. 2d at 1339-40; *Henson v. Celtic Life Ins. Co.*, 621 So. 2d 1268, 1274 (Ala. 1993). Thus, there is no

"discovery rule" to toll the statute of limitations for non-fraud claims.  The timeliness of

plaintiffs' wantonness and negligence claims depends on when they accrued.  *See Booker*, 700

So. 2d at 1339-40.

Claims based upon wantonness or negligence accrue when "the plaintiff can first

maintain the action, regardless of whether the full amount of the damage is apparent at the time

of the first injury."  *Id.* at 1339; *see also Life Ins. Co. of Georgia*, 719 So. 2d at 802.  The

Alabama Supreme Court has further elaborated on the rule of accrual and the statute of

limitations:

> "'If the act of which the injury is the natural sequence is of itself a legal injury to
> plaintiff, a completed wrong, the cause of action accrues and *the statute begins to
> run from the time the act is committed*, be the actual damage (then apparent)
> however slight, and the statute will operate to bar not only for the present damages
> but for damages developing subsequently and not actionable at the time of the
> wrong done; for in such a case the subsequent increase in the damages resulting
> gives no new cause of action.  *Nor does plaintiff's ignorance of the tort or injury .
> . . postpone the running of the statute until the tort or injury is discovered*.'"

*Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983) (first emphasis added) (quoting

*Kelly v. Shropshire*, 75 So. 291, 292 (Ala. 1917)).  Thus, the trigger for statute of limitations

purposes is the point in time when plaintiffs *could* have brought a claim for wantonness or

negligence, regardless of when the full extent of any injury was known.

In this case, if plaintiffs have a wantonness or negligence claim as they allege, that claim

was in existence well before February 3, 1997, the date two years prior to the filing of the

Complaint.  Plaintiffs claimed that Phillips wantonly or negligently failed to perform certain

duties related to providing (1) a suitable raw material for the development of the endframe, and

(2) recommendations, specifications, and advice concerning the mold design and technical services.  (DX I 1 at ¶¶ 37 & 49.)

Specifically, plaintiffs contend that Phillips wantonly failed to disclose the fact that: (i) R-4XT produced excessive outgassing, which would result in the formation of voids, (ii) voids would destroy the strength of the endframe even if dimensional stability was achieved; and (iii) Phillips was developing a new improved version of R-4XT.  (DX I 1 at ¶¶ 27, 28, 29, 30, 33, & 37.)  Plaintiffs' allegations reveal that any injury suffered as a result of Phillips' alleged wantonness occurred perhaps as early as 1993-94 (when Phillips recommended and began selling R-4XT), but unmistakably by June 1996 (during and after the mold trial, when Wareham disclosed the existence of voids while addressing dimensional stability problems at TCM).  (DX II 90 at ¶ 5; DX II 65.)  At the very latest, the claimed wantonness or negligence occurred by the fall of 1996, when Phillips provided TCM its last technical assistance of record, prior to the discovery of the cracks, and when production parts containing cracks were delivered to FASCO.[15]  (DX I 6 at 120-21; DX I 11 at 64; DX II 66 at 1.)  By November 1996, FASCO was receiving parts from TCM, but was concerned about TCM meeting their demand and problems with parts they had received.  (DX I 11 at 46-47; DX I 6 at 120-21.)  On November 21, 1996, FASCO received 15,591 endframes from TCM.  (DX I 11 at 64; *see* DX II 45 (TCM's shipping schedule for the period beginning November 18, 1996, through January 29, 1997).)  Plaintiffs

---

[15] At the latest, plaintiffs' injury occurred, and any wantonness claim accrued, at the time when the cracked parts were delivered, regardless of the parties' awareness of any injury.  *Moon*, 435 So. 2d at 220; *see also B & B Properties v. Dryvit Sys., Inc.*, 708 So. 2d 189, 191-92 (Ala. Civ. App. 1997) (holding that plaintiff suffered legal injury at first indication of problem with product; plaintiff's failure to anticipate the eventual damage did not postpone running of statute of limitations).

could have asserted their wantonness claim more than two years before the Complaint was filed, at the time the alleged wanton act occurred. Plaintiffs' lack of awareness of the full extent of any claimed damage at the time of the first injury is irrelevant. *See Life Ins. Co. of Georgia*, 719 So. 2d at 802; *Booker*, 700 So. 2d at 1339-40. Thus, plaintiffs' claim accrued as early as 1993, but no later than the fall of 1996.

Plaintiffs' negligence claim is similarly flawed. Plaintiffs allege that Phillips acted negligently by: (i) offering for sale and selling R-4XT for use in the molding process, and (ii) failing to properly provide engineering mold design advice and service relating to the development of the endframe and technical service for mold processing. (DX I 1 at ¶ 49.) To the extent plaintiffs were injured by Phillips' alleged negligence, that injury occurred when Phillips first gave technical assistance and discussed product choices in 1993.[16] Again, at the very latest, the injury occurred in June or November 1996, when Phillips rendered its last technical assistance in connection with part production, or in the late fall of 1996 when parts with voids and cracks were used in the production of ABS motors at FASCO. (DX II 74 (Memo from Bartell discussing a February 21, 1997, meeting with Phillips about cracked endframes returned from Kelsey-Hayes, but dated March 12, 1996)[17]; DX II 45 (TCM's shipping schedule revised

_____

[16]  (DX II 85 (Letter dated September 8, 1993, to Goydich, telling him that the RYTON® PPS literature was enclosed); DX II 63 (Letter from Kunc of Phillips to Goydich of Phillips discussing initial recommendations on TCM project dated September 22, 1993).) For more recent technical assistance *see* DX II 69 (Letter from Goydich of Phillips to Whitted of TCM making recommendations dated September 19, 1994); DX II 64 (Letter from Wareham discussing recommendations to TCM after June 11, 1996, mold trial); DX II 65 (Letter from Wareham to Willson of TCM giving recommendations dated June 21, 1996); DX II 66 (Wareham's notes dated November 18, 1996, on recommendations made to TCM).

[17]  The court believes this document is erroneously dated because Kelsey-Hayes had not discovered the cracks by March 1996.

-33-

November 14, 1996; under this schedule all parts were shipped to FASCO before February 3, 1997, more than two years before this suit was filed).)

Ignoring these clear triggers for the wantonness and negligence claims, plaintiffs have characterized later dates as evidence of their first actionable injuries. Plaintiffs claim that TCM's first actionable injury occurred on March 3, 1997, when the mold was taken from TCM, (DX II 79),[18] and that FASCO's first actionable injury occurred when it was forced to switch from plastic back to an aluminum endframe, (PX III 54 at 201-203). (Pl.'s Brief at 12.) These events, however, were not plaintiffs' "first actionable injury."

Plaintiffs cite *McWilliams v. Union Pacific Resources Co.*, 569 So. 2d 702 (Ala. 1990), to support the contention that their negligence and wantonness claims accrued not at the time of Phillips' alleged tortious act, but rather when they suffered damage. (Pl.'s Brief at 11-12.) However, plaintiffs' reliance on *McWilliams* is misplaced. The facts in that case are not analogous. In *McWilliams*, the plaintiff did not suffer <u>any</u> damage or injury from the defendant's negligence in plugging the plaintiff's well, until leakage occurred. *McWilliams*, 569 So. 2d at 704. In this case, if plaintiffs suffered any actionable injury, it was when the voids were discovered in the endframes by Phillips and reported to TCM or, at the latest, when cracks developed in the production endframes or parts with cracks were shipped. These events occurred more than two years prior to the filing of the lawsuit.

*B & B Properties v. Dryvit Sys., Inc.*, 708 So. 2d 189 (Ala. Civ. App. 1997), is more instructive than *McWilliams*. In *B & B Properties*, the plaintiff asserted a negligence and

---

[18] Interestingly, TCM's claimed "first actionable injury" was caused, not by Phillips, but by FASCO, who made the decision to pull the mold before Phillips even visited the TCM facility after the cracking was found. (DX III 98 at 32-33; 43-46; DX III 101.)

wantonness claim arising out of damages from dryvit, synthetic stucco, that had been used to construct the plaintiff's building. *See id.* at 190. More than two years before filing the complaint, the plaintiff noticed discoloration and blistering of the paint on the dryvit. *See id.* at 191. Several years later, the plaintiff discovered water and structural damage related to the dryvit. *See id.* The court held that the negligence and wantonness claims were time-barred because the statute of limitations began to run at the time the plaintiff discovered the discoloration and blistering of the paint, despite the fact that the plaintiff did not anticipate the eventual damage that later became apparent. *See id.* at 191-92. The court ruled that, although the "damage was slight," the plaintiff first suffered a legal injury when it discovered discoloration and blistering, and further commented that the plaintiff "could have maintained an action at that time." *Id.* at 192.

Likewise, if TCM and FASCO suffered a legal injury, it first occurred more than two years before they filed suit when Phillips' R-4XT allegedly produced parts that contained voids and that later cracked during assembly or shipment. The fact that the injuries suffered at that time were slight, or that plaintiffs could not anticipate the full extent of their eventual damage, does not alter the fact that plaintiffs suffered an actionable injury, if at all, more than two years prior to filing the lawsuit. *See, e.g., Moon v. Harco Drugs, Inc.*, 435 So. 2d 218, 220 (Ala. 1983); *B & B Properties*, 708 So. 2d at 191-92. Because plaintiffs' wantonness and negligence claims are barred by the statute of limitations, Phillips is entitled to summary judgment as to these claims.

3.    *The breach of contract claim is time-barred.*

Plaintiffs contend that Phillips breached its contract with TCM[19] by failing to: (i) properly

perform its duties to provide acceptable raw material for development of the endframe,

(ii) provide proper plastic engineering services, (iii) provide proper design engineering advice

and services, and (iv) provide proper technical advice, information and assistance relative to the

injection molding process.  (DX I 1 at ¶ 45.)  Phillips is also entitled to summary judgment on

plaintiffs' breach of contract claim.  Any contractual claim must necessarily be tied to the sale by

Phillips to TCM of R-4XT to be used in the endframe manufactured for supply to FASCO, and

plaintiffs failed to assert that claim within the one-year contracted-for limitations period.

The only contract between Phillips and either of the plaintiffs was the written sales

contract pursuant to which Phillips sold R-4XT to TCM.  (DX III 90 Ex. E.)  "An action for

breach of any contract for sale must be commenced within four years after the cause of action has

accrued.  By the original agreement the parties may reduce the period of limitation to not less

than one year . . . ."  ALA. CODE § 7-2-725(1); *see American Cyanamid Co. v. Mississippi*

*Chemical Corp.*, 817 F.2d 91, 93 (11th Cir. 1987) (affirming summary judgment because claim

was asserted beyond one-year limitations period provided for in contract).[20]

---

[19]  It is axiomatic that "one that is not a party to, or in privity with, a contract cannot sue for
its breach."  *Airlines Reporting Corp. v. Higginbotham*, 643 So. 2d 952, 954 (Ala. 1994).  The
uncontroverted evidence demonstrates that FASCO was not a direct party to the contract between
Phillips and TCM.  (DX II 90 Ex. E.)  Thus, any breach of contract claim asserted by FASCO would
necessarily have to be derivative of, or dependant upon, TCM's breach of contract claim.  Because
TCM's claim is untimely, any putative claim of FASCO derivative of TCM's rights would also be
untimely.

[20]  *See also NMP Corp. v. Parametric Technology Corp.*, 958 F. Supp. 1536, 1548 (N.D.
Okla. 1997) (upholding contractual limitations period of one year under state law version of § 7-2-
725); *Schweizer v. DeKalb Swine Breeders, Inc.*, 954 F. Supp. 1495, 1506-07(D. Kan. 1997) (same);

In this case, Phillips and TCM contractually agreed to reduce to one year the limitations period for contract-based claims. (DX II 90 at ¶ 4, Ex. E at 2.) Section four of Phillips' Terms and Conditions of Sale expressly provides that "[a]n action for breach of this contract (except for non-payment by BUYER) must be commenced within one year after the occurrence of the breach." (DX II 90 Ex. A.) Phillips' Terms and Conditions of Sale were specifically made a part of the October 1996 contract between Phillips and TCM and were provided to TCM with every shipment of R-7 or R-4XT beginning in 1993. (DX II 90 at ¶¶ 4-9, Ex. E.) Because Phillips and TCM agreed to reduce the period within which to bring contract claims to one year, all contract-based claims commenced beyond one year are time-barred.

In their response brief, plaintiffs argued that the contract under which they are suing "is not based on their purchase of [R-4XT]," but rather is an alleged oral agreement whereby Phillips agreed to provide plastic engineering and technical service and advice. (Pl.'s Brief at 15.) Plaintiffs did not produce any evidence that an oral contract for the providing of these services actually existed. (*See* Def.'s Reply Brief at 8.)[21] Thus, plaintiffs were required to bring any contract-based claim within one year of its accrual.

---

*Mead Corp. v. Stevens Cabinets, Inc.*, 938 F. Supp. 87, 89 (D. Mass. 1996) (same); *Citizens Ins. Co. of America v. Proctor & Schwartz, Inc.*, 802 F. Supp. 133, 136-137(W.D. Mich. 1992) (same).

    [21] The written contract expressly states that it "constitutes the entire agreement between the parties hereto regarding the sale and purchase of [R-4XT], and no prior Letter of Agreement, promises, or agreements written or oral, shall be of any force or effect from and after the effective date hereof [November 1, 1996] unless otherwise embodied herein." (DX II 90 Ex. E.) Such merger clauses are enforceable in Alabama. *See, e.g., Crimson Indus., Inc. v. Kirkland*, 736 So. 2d 597, 601 (Ala. 1999); *Crown Pontiac, Inc. v. McCarrell*, 695 So. 2d 615, 618 (Ala. 1997). Nowhere does the written contract bind Phillips to provide any kind or amount of technical assistance to plaintiffs related to their use of R-4XT.

As previously discussed, the § 6-2-3 savings provision does not apply to non-fraud claims. *See Booker*, 700 So. 2d at 1339-40. Thus, plaintiffs' breach of contract claim began to run at the time it accrued. *See id.* A cause of action for breach of contract accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. ALA. CODE § 7-2-725(2); *AC, Inc. v. Baker*, 622 So. 2d 331, 333 (Ala. 1993). Even assuming that plaintiffs could read into the contract some obligation by Phillips to provide technical advice and assistance, the purported contractual duties that Phillips allegedly breached are virtually identical to those complained of in plaintiffs' negligence claim. If, as plaintiffs have contended, the cracks were caused by voids in the Phillips material during molding or were the result of some assistance, or lack of assistance, provided by Phillips, the contract claim accrued when the material was sold or when the advice was rendered, all of which occurred well before February 1998. TCM's awareness of any such breach is irrelevant. Even assuming the best case for plaintiffs, that the cause of action did not accrue until the cracks were actually discovered by Kelsey-Hayes in February 1997, the claim is nonetheless time-barred under the contractual limitations period.

**B.     Plaintiffs Cannot Prove Critical Elements of Their Claims.**

Even if plaintiffs had filed their claims within the applicable limitations periods, Phillips would still be entitled to summary judgment, as neither plaintiff has presented evidence upon which a reasonable jury could find all required elements of plaintiffs' claims against Phillips to be proven.

1.   *There is insufficient evidence to support plaintiffs' fraudulent suppression claim.*

To succeed on their fraudulent suppression claim, plaintiffs were required to prove that: (i) Phillips had a duty to disclose a material fact, (ii) Phillips suppressed or failed to disclose this fact, (iii) Phillips' suppression of this fact induced plaintiffs to act or to refrain from acting; and (iv) plaintiffs suffered actual damages as a proximate result. *See, e.g., State Farm Fire & Cas. Ins. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998); *Foremost Ins. Co. v. Parham*, 693 So. 2d 409, 423 (Ala. 1997). The crux of plaintiffs' fraudulent suppression claim is that Phillips suppressed the fact that R-4XT produced excessive outgassing, which would result in the formation of voids, and that voids would destroy the strength of the endframes. (DX I 1 at ¶¶ 27-28.) The undisputed evidence in this case, however, demonstrates that Phillips did, in fact, disclose all material information to TCM and that Phillips had no duty to make any disclosure to FASCO, with whom Phillips had no relationship during the period in question.

a.   **There was no suppression of material information from TCM.**

First, there is insufficient evidence on which a reasonable jury could find that R-4XT produced excessive outgassing that led to voids in the part. Though R-4XT can produce gas, or "outgas," when processed, the evidence shows that the voids present in the endframes were produced by shrinkage of the plastic in an underpacked part, not by the presence of any gas. (DX II 65 at 2; DX I 15 at 436-37; DX I 3 at 205-06; DX II 65 at 2.) Outgassing typically manifests itself as burned areas on the exterior of the part, or as "plate-out" on the mold surface. (DX I 17 at 143-44; DX I 7 at 43.) Phillips' Ryton product literature advises users to vent their molds to lessen or avoid such occurrences. (DX II 58 at RFD00011616.)

-39-

At the court's request, plaintiffs submitted on October 12, 2000, certain deposition exhibits and excerpts of testimony that plaintiffs asserted showed the claimed connection between "excessive outgassing" and void formation. (Pls.' Letter Br.)[22] The various items of evidence submitted primarily address whether outgassing can, in a general sense, cause voids or create holes or air pockets in parts, and even that testimony is inconclusive. (Pls.' Letter Br. and attached exhibits.) Plaintiffs cite King's testimony to support their contention that excessive outgassing in the part caused voids. (Pls.' Letter Br. Ex. 1 at 155-57.) King was first asked, "[a]re you aware of any relationship between excessive outgassing during processing of an injection-molded parts, say the Ryton R4XT, and the formation or existence of voids . . . ?" (Pls.' Letter Br. Ex. 1 at 155.) King responded that he was "not specifically aware in anything that I've done up to this point of that being an issue." (Pls.' Letter Br. Ex. 1 at 155.) King later testified that an improperly vented part can plug the vents trapping gas that may cause voids. (Pls.' Letter Br. Ex. 1 at 156-57.) Plaintiffs also cite to Giovannetti's testimony to support their contention that excessive outgassing in the part causes voids. (Pls.' Letter Br. Ex. 5 at 47.) Giovannetti testified that voids were generally caused by shrinkage, but that improper venting could trap gas and cause voids. (Pls.' Letter Br. Ex 5 at 47.) However, this testimony demonstrates that improper venting could create voids, but fails to prove that R-4XT exhibits excessive outgassing. Only one excerpt, from the deposition of former Phillips marketing representative Davis, even addresses outgassing and the actual part at issue, (Pls.'s Letter Br. Ex.

---

[22] Plaintiffs submitted letter briefs to the court on October 12, 2000. Attached to Plaintiffs' Letter Brief were exhibits. References to the exhibits in plaintiffs' letter brief will be cited as "Pls.' Letter Brief Ex." followed by the corresponding number.

3), and that testimony does not constitute evidence that would prevent entry of judgment in favor of Phillips, as it fails to establish any connection between outgassing and voids in the endframe.

In his deposition, Davis answered several questions posed by plaintiffs' counsel about a multi-page, highly technical report prepared by Phillips engineer Patrick Kunc summarizing the result of computer modeling Kunc performed on the endframe part design after the cracks were discovered. (DX II 88.) Acknowledging that he was "going to try and shorten things and not read all of [the report]," (Pls.' Letter Brief Ex. 3 at 260), plaintiffs' counsel read from the report as follows:

> Q:    [P]icking up here from the bottom of the paragraph, [Kunc] says, the resulting weld and mold lines shown in Figure 21 which illustrates the places where the flow front separates and comes back together and usually has lower strength. Weld lines are produced[23] in each location where the crimp load is applied. This could be an area where cracks could develop, although none have been reported. They form there because it is locally thinner, and the material races around the thicker back walls backfilling to form the weld line. This is also seen in the short shots.
> Now, is Mr. Kunc indicating there that you're seeing voids form as a result of trapped outgassing caused from poor knit line or weld lines being developed in this part?
>
> A:    That's what the report states.

(Pls.' Letter Br. Ex. 3 at 261.) Though plaintiffs put forth Davis's response as evidence of their theory that outgassing of the R-4XT created voids in the endframe part, a review of the testimony reveals the tenuity of plaintiffs' "evidence." First and foremost, Davis's response is simply inaccurate. The error of his statement that the Kunc report "states" the proposition suggested by plaintiffs' counsel is readily apparent upon a review of Kunc's report. (DX II 88 at

_____

[23] The actual report says "Weld lines are _predicted_ in each location where the crimp load is applied." (DX II 88 (emphasis supplied).)

PH00000210-11.)  Nowhere in Kunc's report is there any statement about voids forming "as a result of trapped outgassing caused from poor knit line or weld lines being developed in [the] part."

Additionally, Davis expressly testified, when discussing an unrelated Chrysler part, that he lacked expertise about the very subject matter on which plaintiffs offered his testimony as proof in this case:

Q:     (By Mr. Drinkard)  All right.  Now, what does reduce molded part knit line strength mean to you?

A:     Where the two flow fronts of the material come together, it's a weak point.

Q:     And why is it that outgassing causes a weak point where the flow fronts come together?

A:     **From a technical perspective, I don't have that answer for you.**

Q:     Do you know how that weakness in the flow line is presented within the wall of the part?
             . . .

A:     Are you asking what it looks like?

Q:     Yes.  Very good.

A:     Essentially you have – the material comes in, and it's a rounded front when it's coming in.  There are a couple of issues that happen with knit line strength.  You have a weak spot there because the glass fiber is not oriented in a straight line, so you have it kind of curled over.  The glass fiber is the reinforcement for the plastic.  Also you're trapping air in there so if there is no venting in that area, then you're compressing air and burning whatever gases are in there.

Q:     Can it present itself with voids in that area?

A:     **Again, that's beyond my – my expertise.**

-42-

(Pls.' Letter Brief Ex. 3 at 72-73) (emphasis added.)

Plaintiffs' evidentiary submission was more telling for what it did not include than for what it contained. Plaintiffs relied on the confused discussion of Davis about Kunc's report in an attempt to draw a connection between outgassing and voids, but plaintiffs included no testimony from Kunc, the author of the report, about the same topic. Plaintiffs' omission is understandable upon a review of Kunc's deposition: Kunc draws no connection whatsoever between outgassing and voids in the endframe, whether at the weld lines or otherwise.[24]

Moreover, in addition to Kunc, none of the other witnesses possessing or claiming to possess technical knowledge and expertise about plastics, including plaintiffs' own plastics expert Robert Staats-Westover, testified that the R-4XT produced outgasses that created voids in the endframe parts.[25] The inaccurate interpretation of a highly technical report by a former salesman who disavowed the technical expertise necessary to interpret the report represented the best evidence plaintiffs could muster in support of their theory that excessive outgassing of the R-4XT created the voids in the endframe part; therefore, the court concludes as a matter of law

---

[24] The irrelevance of plaintiffs' argument connecting outgassing, voids and weld lines is shown by the very portion of Kunc's report quoted in the Davis deposition, which clearly states that the weaker weld line "could be an area where cracks could develop, although none have been reported." (DX II 88 at PH00000211.) Thus, even assuming that plaintiffs' theory connecting voids and outgassing had any technical merit, it has no bearing in this case, because the cracks that were reported were not at the weld line where plaintiffs claim voids formed from outgassing.

[25] To the contrary, Wareham, the Phillips plastics engineer who discovered and examined the voids upon cross-sectioning endframe parts after the June 1996 mold trial, explained to TCM in his June 21, 1996 letter that "[v]oids from injection molding are typically vacuum voids created from the shrinkage of material." (DX II 65 at 2.) Wareham then discussed at some length how TCM could reduce the risk of shrinkage voids by packing more molecules of plastic into the mold. (DX II 65 at 2.)

that Phillips could be under no duty to disclose false or erroneous information that has no bearing in fact.

Notably, however, Phillips disclosed to TCM the fact that voids may develop in the endframes due to improper processing and that these voids could be detrimental to the overall strength of the part. (DX II 58 at RFD00011607, FRD00011608, RFD00011613.) In Phillips' Ryton technical literature, which TCM received twice in 1990, (DX II 83 & 84), and again in 1993, (DX II 85), Phillips clearly informed TCM, among other things, that utilization of improper molding practices could result in underpacked parts, voids, warpage, shrinkage, non-crystalline parts, and poor mechanical strength. (*See* DX II 58.) Injection molders would be expected to read, understand, and rely upon technical literature such as the information supplied by Phillips. (DX I 3 at 142-46.) To the extent TCM had questions, Phillips provided a toll-free number. (*See, e.g.,* DX II 58 at RFD00011544.) In fact, Sharp, the TCM employee chiefly responsible for development of the endframe project, testified that TCM knew that the endframes in all likelihood contained voids because most plastics contain voids. (DX I 15 at 436-37.) TCM employee, Mansell, testified that he sectioned parts and observed voids, that TCM was aware of the fact that TCM needed to eliminate the voids, and that TCM was trying to eliminate the voids. (DX I 12 at 146.)

Even more significant is the fact that Phillips explained the existence of voids that were discovered during the June 1996 mold trials to TCM in Wareham's June 21, 1996, letter to Willson. (DX II 65.) In that letter, Phillips "propose[d] some ideas to eliminate the voids" and discussed suggestions for "improvements in eliminating voids <u>and</u> stabilizing dimensions," including specific recommendations regarding molding pressures and rates. (DX II 65 at 12)

-44-

(emphasis added.)  The Ryton technical literature notes that use of maximum injection pressure is desirable to create well-packed parts "with fewer voids, less warpage, and lower shrinkage," and that maximum injection pressure "will also insure part to part uniformity and better dimensional stability."  (DX II 58 at RFD00011517.)

Bartell, FASCO's chief engineer on the ABS project, testified that knowledge of the existence of voids in the endframes would certainly have been a concern for FASCO.  (DX I 2 at 74-75.)  Bartell's testimony establishes that Wareham's June 21, 1996, letter was a sufficient disclosure of the fact that voids could cause problems in the endframes.  Bartell stated that he would not agree, "under any conditions," with any reading of the letter suggesting that as long as TCM could achieve dimensional stability, the voids were not a problem.  (DX I 2 at 75.)  FASCO president Doyle also testified that any competent molder would have known that voids in a part were not good.  (DX I 8 at 76.)  Phillips' expert Beall opined that Phillips did all that a material manufacturer could have done to warn TCM about voids and how to eliminate the voids.  (DX II 61 at 12, 15, & 18.)

Even if plaintiffs could logically assume that dimensional stability was the key indication of proper part processing, the evidence reveals that TCM never actually achieved dimensional stability, but instead had to agree to check one hundred percent of the parts for accuracy on the hub diameter measurement to avoid sending FASCO non-conforming parts.  (DX II 37.)  FASCO personnel testified that TCM had not achieved dimensional stability on the hub diameter well into production, because FASCO continued to receive non-conforming parts despite the one hundred percent gauging.  (DX I 2 at 50.)  Thus, even under plaintiffs' interpretation of

-45-

Wareham's letter, TCM still knew, during the critical production phase, that it had not cured its

processing problems and that the parts likely continued to contain voids.

In addition, to the extent plaintiffs place significance on the existence of weld lines in the

endframe, the Phillips technical literature makes it clear that weld lines are areas of potentially

diminished strength, that stresses should not be placed on weld lines, and that proper venting

should be used when processing the R-4XT to avoid trapping and burning gas. (DX II 58 at

RFD00011608 ("Weld lines can reduce mechanical strength. If possible, the weld lines should

be eliminated or located in an area with lower load requirements. . . . Weld line strength depends

heavily on processing, so the part and tool design should allow for rapid injection and thorough

packing."), at RFD00011616 ("To successfully mold Ryton PPS compounds proper venting is

essential. Poor or improper venting results in hard to fill parts and burning of the part in areas

where gas is trapped."), at RFD00011616 ("If the part cannot be molded without weld line(s), the

weld line(s) should be placed in the thickest section of the part or in areas where there is minimal

stress.").) Again, the risk of decreased weld line strength, and ways of avoiding or minimizing

that risk, were disclosed to TCM in the literature provided on several occasions at the inception

of the project.

The uncontroverted evidence establishes that Phillips discharged its duty to TCM to

disclose the pertinent information about voids and the appropriate processing of its R-4XT.

Based on the information that had been disclosed to TCM, TCM could not have been induced to

act to its detriment. TCM failed to present evidence upon which a reasonable jury could find

Phillips guilty of fraudulent suppression.

-46-

**b.**   **FASCO cannot maintain a suppression claim because Phillips owed no duty to FASCO to disclose any information.**

As a threshold matter, Phillips did not owe a duty to FASCO to disclose information regarding voids and the endframes. To succeed on a fraudulent suppression claim, FASCO must prove: (1) that the defendant suppressed a material fact; (2) that the defendant had a duty to communicate that fact, arising from a confidential relationship or from the circumstances of the case; and (3) that the plaintiff was damaged as a result of the suppression. *Ex parte Farmers Exchange Bank,* 2000 WL 968502, at *2 (Ala. July 14, 2000). The issue in this case is whether Phillips had a duty to disclose to FASCO the existence of voids in the part and the fact that voids could reduce overall strength. (DX I 1 at ¶¶ 27-29.)

The existence of a duty to disclose is a question of law to be decided by the trial court. *Owen*, 729 So. 2d at 839. The trial court should decide whether, assuming all of the plaintiff's allegations are true, they are sufficient to give rise to a legal duty. *Id.* at 840. Even if all of the plaintiff's facts are true, if the trial court determines that no duty is owed, summary judgment is appropriate. *Id.* There can be no actionable fraud without a breach of a legal duty owed by the defendant to the plaintiff. *George v. Federal Land Bank,* 501 So. 2d 432, 435 (Ala. 1987). It is undisputed that Phillips had no contractual relationship with FASCO. However, "in an action alleging suppression of a material fact, a duty to disclose may be owed to a person with whom one has not had a contractual relationship or other dealings." *Carter v. Chrysler Corp.,* 743 So. 2d 456, 461 (Ala. Civ. App. 1998) (citations omitted). A duty to disclose may arise either from a confidential relationship with the plaintiff or from the particular circumstances of the case. ALA.

-47-

CODE § 6-5-102. The Alabama Supreme Court has defined a confidential relationship as

follows:

> "'[A relationship in which] one person occupies toward another such a position of adviser or counselor as reasonably to inspire confidence that he will act in good faith for the other's interests, or when one person has gained the confidence of another and purports to act or advise with the other's interest in mind; where trust and confidence are reposed by one person in another who, as a result, gains an influence or superiority over the other; and it appears when the circumstances make it certain the parties do not deal on equal terms, but on the one side, there is an overmastering influence, or, on the other, weakness, dependence, or trust, justifiably reposed; in both an unfair advantage is possible. It arises in cases in which confidence is reposed and accepted, or influence required, and in all the variety of relations in which dominion may be exercised by one person over another.'"

*General Motors Corp. v. Bell*, 714 So. 2d 268, 280 (Ala. 1996) (citations omitted).

There is no evidence to indicate that there was a confidential relationship between Phillips and

FASCO.  In fact, the evidence demonstrates that, prior to discovery of the cracking, when

FASCO requested Phillips' assistance, there was no relationship at all between Phillips and

FASCO, as there were no communications or transactions between Phillips and FASCO relating

to Phillips sale of R-4XT to TCM or to the development of the endframes.  (DX II 34.)  Thus, no

confidential relationship existed between Phillips and FASCO.  In the absence of a confidential

relationship, no obligation to disclose arises when information is not requested.  *See Trio*

*Broadcasters, Inc. v. Ward,* 495 So. 2d 621, 623 (Ala. 1986).  Thus, Phillips had no duty to

FASCO until FASCO requested Phillips' assistance on February 21, 1997, after cracks were

discovered by Kelsey-Hayes on February 14, 1997.  (DX II 74.)

Plaintiffs state in their brief that after Kelsey-Hayes discovered the cracked parts that they

contacted Phillips.  (Pl.'s Brief at 8.)  Plaintiffs state that "[t]his is the first correspondence in

-48-

which one of . . . Phillips representatives explains the dangers of voids to strength." (Pl.'s Brief at 8.) Thus, plaintiffs do not claim Phillips' conduct at that point was fraudulent nor does the evidence demonstrate that it was fraudulent. Prior to this time, no one at FASCO had ever asked Phillips for advice or assistance, but instead had relied on TCM's expertise. (DX I 2 at 64; DX II 34.) Therefore, any duty owed by Phillips to FASCO would have to be based on the particular circumstances of the case.

Under section 6-5-102, in order to determine whether the particular circumstances of the case give rise to a duty to disclose the court must consider: (i) relationship of the parties,[26] (ii) relative knowledge of the parties, (iii) value of the fact suppressed, (iv) plaintiff's opportunity to discover the fact, (v) customs of the particular trade, and (vi) other relevant circumstances. *Owen*, 729 So. 2d at 842-43. Moreover, before an obligation to disclose can be imposed, "the relationship existing between the parties, while not necessarily required to be confidential, must nonetheless be such that a disclosure of material information is dictated." *General Motors Corp. v. Bell*, 714 So. 2d 268, 281 (Ala. 1996). There is no evidence in this case that there was any relationship between Phillips and FASCO relating to the sale of R-4XT or the development of the endframes. In fact, FASCO memorialized its lack of contact with Phillips during the relevant time frame in a memo dated November 19, 1998, in which Witgen stated that "FASCO engineering had no direct contact (verbal or written) with any Phillips 66 personnel prior to the discovery of the cracked production endframes in February 1997." (DX II 34.) Rather, Phillips

---

[26] Notably, where an arm's-length commercial relationship exists, Alabama courts have refused to impose a duty based on special circumstances, where, as here, both parties are sophisticated business entities capable of protecting their own interests. *See, e.g., Ford Motor Credit*, 717 So. 2d at 787; *Bama Budweiser of Montgomery, Inc. v. Anheuser-Busch, Inc.*, 611 So. 2d 238, 246 (Ala. 1992); *Trio Broadcaster, Inc. v. Ward*, 495 So. 2d 621, 624 (Ala. 1986).

had the relevant contractual relationship with its customer, TCM, (DX II 90 Ex. E), to whom

Phillips made all necessary disclosures. According to Bartell, FASCO "really did not count on

Phillips at all on this program," instead, FASCO "counted on the expertise of [TCM]." (DX I 2

at 64.)[27]

During oral argument on defendants' Motion for Summary Judgment, plaintiffs' counsel

suggested that some relationship existed between FASCO and Phillips based on the fact that

former Phillips employee Davis was "responsible" for FASCO. The evidence demonstrates,

however, that Davis merely served as one of the Phillips sales representatives in the Detroit area,

and FASCO was located within his sales territory. (Def.'s Letter Brief Ex. 3 at 48.) As the

testimony of Davis makes clear, Davis's contact with FASCO prior to the discovery of the

cracking was limited to superficial sales calls consistent with his general marketing duties and

had nothing whatsoever to do with the endframe project:

> Q:    (by Mr. Drinkard) With respect to your involvement then, it occurred after
>       there was a part failure after production had started; is that right?
>
> A:    I became involved in this – I believe I got a phone call from someone at
>       Eaton Technologies or FASCO when they discovered they had a cracked
>       part.
>
> Q:    Why did they call you?
>
> A:    Because I again was in the area of where Eaton or FASCO was located.
>
> Q:    But you had had no previous contact with these people?

---

[27] Bartell's testimony also demonstrates FASCO's inability to prove the required element
of reliance, or inducement to act. As noted by Bartell, FASCO never contacted Phillips or counted
on Phillips with regard to any aspect of the endframe project during the period in question, but
instead "counted on the expertise of [TCM]." (DX I 2 at 64.) The silence of an entity on whom
FASCO placed no reliance for guidance or leadership in the project simply could have not induced
FASCO to do, or not do, any particular act.

A:      I may have dropped off a business card to someone when I was passing
        through the area, but there [were] no meetings that took place with anyone
        prior to that.

Q:      You don't remember talking to anybody at Eaton prior to them calling you
        about this problem?

A:      No. Like I said, before, I dropped off a business card. I may have made a
        phone call and said, hey, I'm a Phillips guy in the area. If you ever need
        any assistance, here I am.
             . . .

Q:      Just so I'm being real clear, you had absolutely no exposure during any of
        the preproduction design work, the prototype, any of the mold trials that
        occurred between 1993 and 1996, the end of '96, on this part?

A:      I don't believe so, no.
             . . .

Q:      All right. This previously had not been your account. You hadn't sold
        them anything; right?

A:      FASCO did not purchase a material, no.

Q:      And you had not provided any services to FASCO?

             . . .

A:      No.

(Def.'s Letter Brief Ex. 3 at 48-51.)

        Thus, notwithstanding plaintiffs' argument at the summary judgment hearing, as shown

by the consistent testimony of Bartell and Davis as well as by FASCO's own internal

memorandum, it is beyond dispute that Phillips and FASCO had no relationship during the

period in question. Recognizing that fact, plaintiffs cited three Alabama cases – *Nelson v.*

*Meadows*, 684 So. 2d 145 (Ala. Civ. App. 1996); *Ex parte Grande Manor, Inc. v. Dykes*, 2000

-51-

WL 337528 (Ala. 2000); and *Lance, Inc. v. Ramanauskas*, 731 So. 2d 1204 (Ala. 1999) – that they claim create a right of action for FASCO to recover against Phillips even absent a relationship. (*See* Pls.' Letter Brief.) These decisions do not, however, support the existence of a duty on the part of Phillips to plaintiff FASCO. To the contrary, viewed in light of the undisputed facts concerning this case, these cases demonstrate the absence of such a duty.

*Nelson* and *Ramanauskas* are two personal injury cases and are easily distinguished. In *Ramanauskas*, a child was electrocuted to death by a vending machine at a motel. *Ramanauskas,* 731 So. 2d at 1208. The child's parents sued the company that owned the vending machine, Lance, Inc. ("Lance"). *See id.* 1209. Lance, claimed that it owed no duty to the child or the child's parents. *See id.* The court disagreed. *See id.* Lance had entered into a contract with the motel in which Lance agreed to "'maintain and keep [the vending machine] in good working order.'" *Id.* at 1209. Lance admitted that this contractual obligation imposed a duty to keep the vending machine in a safe condition. *See id.* Therefore, the court found Lance had assumed a duty to keep the vending machine on the motel's property in a safe condition for the users of the machine. *See id.* The contract of sale between Phillips and TCM required Phillips provide resin to TCM, not provide a service to TCM for the benefit of other parties.

In *Nelson*, the plaintiffs brought suit against the City of Dothan claiming that Dothan had failed to properly design, maintain, and construct traffic lights at the intersection in which plaintiffs were injured in a car wreck. *Nelson*, 684 So. 2d at 147. The City argued that it had not negligently maintained the intersection and had no duty to properly design or construct the intersection because it was under the control of the state. *See id.* 149. The City, however, had contracted with the state to operate and maintain the traffic lights at the intersection. *See id.*

Additionally, the contract stated: "In the event future traffic conditions require changes or adjustments (other than ordinary timing), the [State] will be informed and approvals gained before such changes are made." *Id.* The court held that the City had a duty to the plaintiffs because under the contract "the City was to inform the State '[i]n the event future traffic conditions require changes or adjustments,'" and plaintiffs presented evidence of twenty-eight similar car wrecks at the intersection. *Id.* at 149-150. The contract in the present case is distinguishable from the contract in *Nelson.* The contract in this case is for the sale of goods. The contract in *Nelson* placed an ongoing duty upon the City to operate, maintain, and monitor traffic conditions at the intersection. *See id.* at 149. The City of Dothan's contract required the ongoing monitoring of third parties use of the intersection, the contract in this case did not require Phillips to do more than deliver its product.

Neither of these decisions relate to the question of whether there can be a duty to disclose, and a resulting suppression claim for the failure to disclose, in the absence of any relationship or dealings between plaintiffs and defendant. The *Grande Manor* decision holds that, where a fraudulent statement is made "with the intent and expectation" that the one to whom it is made will pass it on to the plaintiff, the plaintiff can rely on the statement even if it is not made directly to the plaintiff. *Grand Manor*, 2000 WL 337528, at *6. In this case, there is no evidence of any statement made to TCM with the intent that it be passed on to FASCO. In fact, plaintiffs have abandoned their misrepresentation claim.

All three decisions cited by plaintiffs involve a factual situation – an admitted written contract imposing a duty upon defendants to act reasonably in performing their contractual obligations – that is not present in this case. All the decisions are premised upon the general rule

that a party to a contract who assumes a duty to another party to a contract may, under certain situations, owe a duty to others not in privity to perform his duties without negligent injury to such others. *See, e.g., Ramanauskas*, 731 So. 2d at 1209.

As discussed below, there is no evidence of any contract between Phillips and TCM in which Phillips agreed to provide technical services to TCM. The court has previously noted that plaintiffs' own witnesses have disavowed any knowledge of such an agreement, and the only written agreement between the parties contains a merger clause that states there are no other agreements or understandings between the parties. Thus, plaintiffs' authority does not support the creation of any duty to disclose owed by Phillips to a remote third party, FASCO.

In the instant case, for example, Phillips was obviously aware that TCM was molding the endframes for sale to FASCO, but Phillips was also aware that FASCO intended to assemble the endframes on brake motors for delivery to Kelsey-Hayes, and that Kelsey-Hayes would add its own component before selling its assembly to car manufacturers for installation on vehicles to be sold to consumers. Even assuming for the sake of argument that Phillips had some material information that it had not disclosed to TCM, where would the amorphous duty suggested by FASCO end? With FASCO? Would Phillips also be required to contact Kelsey-Hayes, or to send letters to all car manufacturers that might do business with Kelsey-Hayes? Acceptance of the arguments made by FASCO would create such a duty, for Phillips had no greater relationship with FASCO than it did with any other entity down the chain of consumption. Even in the context of products liability, where strict liability might be imposed in cases of personal injury, property damage, or death to remote users, the requirement of privity has not been removed for cases of solely economic loss. *See, e.g., Rhodes v. General Motors Corporation*, 621 So. 2d 945,

-54-

947 (Ala. 1993); *Lloyd Wood Coal Company v. Clark Equipment Company*, 543 So. 2d 671, 674

(Ala. 1989). There exists no basis in logic or the law to so extend fraud liability.

Moreover, the so-called "duty" argued by FASCO, had it been honored by Phillips, would

in all likelihood have exposed Phillips to potential tort liability. TCM maintained a contractual

or business relationship with FASCO related to the manufacture and sale of the endframes. As

noted above, Phillips was in no way a party to that relationship. Had Phillips called FASCO, on

its own initiative, and advised FASCO that TCM was molding non-conforming parts that

contained voids, and that TCM was operating with substandard molding equipment, and FASCO

as a result had terminated the business and pulled the mold from TCM, it is likely that Phillips

would have been sued by TCM for intentional interference with its business and contractual

relations. *See generally, Barber v. Business Prods. Center, Inc.,* 677 So. 2d 223, 227 (Ala. 1996)

(One element of a claim for intentional interference with business or contractual relations is

intentional interference by the defendant with the plaintiff's business relationship with a third

party.) It is illogical that, in order to avoid a suppression claim, a company in the position of

Phillips could be required to make disclosures, the dissemination of which would subject it to

tortious interference liability. Phillips surely could expect TCM to keep its own customer

informed about the status of the manufacturing process and should not bear the cost of TCM's

arguable breach of *its* duty to disclose material facts to FASCO. Therefore, the court is of the

opinion that reasonable juror could not conclude that Phillips owed FASCO a duty. Thus,

summary judgment is due to be granted in favor of defendant on plaintiffs' fraudulent

suppression claim.

## 2.    *Plaintiffs cannot support the elements of a wantonness claim.*

Alabama law defines wantonness as the conscious or intentional doing of some wrongful act, or omission of a known duty, with reckless indifference to the consequences. *See, e.g., Carter v. Treadway Trucking, Inc.*, 611 So. 2d 1034, 1035 (Ala. 1992). To be actionable, the act or omission must have proximately caused the injury of which the plaintiff complains. *See id.*

Plaintiffs contend that Phillips acted wantonly by failing to disclose that: (i) R-4XT produced excessive outgassing, which would result in the formation of voids, (ii) voids would destroy the strength of the endframe even if dimensional stability was achieved; and (iii) Phillips was developing a new improved version of R-4XT. (DX I 1 ¶37.) The undisputed evidence indicates, however, that Phillips discharged any duty it may have owed to plaintiffs.

As discussed above, plaintiffs' assertion that R-4XT produced excessive outgassing that created voids in the part is unfounded. There is no evidence on which a reasonable jury could find that the voids in the endframes were actually caused by outgassing, as opposed to shrinkage of the plastic in underpacked parts. Phillips could not have been under any duty to disclose false or erroneous information, and its failure to convey incorrect information cannot support a valid wantonness claim.

As early as 1990, Phillips disclosed to TCM the fact that voids could develop in molded parts and that voids could be detrimental to the overall part strength. (DX II 58.) Phillips also correctly advised TCM that its endframes contained voids, told TCM how to look for voids on its own, and gave TCM advice on how to improve its processing to eliminate the voids. (DX II 65.) As discussed above, TCM knew that voids were likely to occur and that they should be eliminated to the extent possible. (DX I 15 at 436-37; DX I 12 at 146.) To the extent there could

be any implied duty on the part of Phillips to warn TCM about voids, that duty was fully discharged, as evidenced by TCM's admitted knowledge of the likelihood of voids being present in the part and the affects voids have on the part.

Plaintiffs' claim that Phillips wantonly failed to disclose that it was developing an improved version of R-4XT is likewise without merit. The evidence reflects that Phillips was, for a period of some years in the mid- to late-90s, in the process of developing BR-4-200, a potential successor to R-4XT. However, BR-4-200 was not commercially available at the time that Phillips sold TCM R-4XT for the endframe project. (DX I 9 at 376-77,407-8.) Phillips had no duty to inform TCM of a developmental product that it was not yet prepared to distribute commercially. Moreover, even if BR-4-200 had become commercially available during the course of the endframe project, as a new product, it would have lacked the automotive industry's approval for use under the hood. (DX I 6 at 193-94; DX I 14 at 215.) Given FASCO's pressure for more parts than TCM could deliver in the critical production period, it is speculative at best that plaintiffs would have waited for certification of the new material by the automobile manufacturers to enable a shift of materials, even if it had been an option. Such speculation cannot be the basis for a claim against Phillips.

Having established the critical weaknesses in plaintiffs' wantonness claim arising out of Phillips' interactions with TCM, with whom Phillips actually had a relationship, the weakness of any claimed independent right of action on the part of FASCO is apparent. As discussed above in the fraudulent suppression context, there was no relationship between Phillips and FASCO relating to the sale of R-4XT or the development of the endframes, and the cases cited by plaintiffs to support their claim that Phillips owed a duty to FASCO are inapposite. With the

-57-

exception of the decision in *Ex parte Grande Manor, Inc. v. Dykes*, 2000 WL 337528 (Ala.

2000), the cases cited by plaintiffs involved personal injury or death claims. Moreover, even in

*Grande Manor*, the plaintiffs were denied recovery on their negligent manufacture claim

because, as here, the damage was to the product itself. *See Ex parte Grande Manor*, 2000 WL

337528 at, *4. "It has been widely recognized that one cannot recover in tort for damage to the

product itself: '[a] defective product is a loss of the benefit of the bargain which is a contract

rather than a tort action . . . .'" *Dairyland Ins. Co. v. General Motors Corp.,* 599 So. 2d 44, 46

(Ala. 1989). Therefore, the court is of the opinion that no reasonable juror could conclude that

Phillips acted wantonly. Thus, defendant is entitled to summary judgment on plaintiffs' claim

for wantonness.

### 3.    *Plaintiffs cannot prove the elements of a negligence claim.*

To recover for negligence, plaintiffs must show that: (i) Phillips owed a duty to

plaintiffs[28] to act with reasonable care, (ii) Phillips breached its duty, and (iii) Phillips' breach

proximately injured plaintiffs. *See South Coast Properties, Inc. v. Schuster,* 583 So. 2d 215, 217

(Ala. 1991). Plaintiffs claim that Phillips acted negligently by: (i) offering for sale and selling R-

4XT for use in molding the endframes, and (ii) failing to properly provide engineering mold

design advice and service relating to the development of the endframe and technical service for

mold processing. (DX I 1 at ¶ 49).

The undisputed evidence establishes that Phillips' sale of R-4XT for molding the

endframes was not negligent. First, it was not Phillips' duty or responsibility to assess the

_____

[28] As held above, Phillips owed no duty to FASCO, and thus could not be liable for any
breach of duty.

feasibility of R-4XT for use in the project. (DX II 61 at 11.) In fact, the Society of the Plastics Industry's "Standards & Practices of Plastics Molders" indicates that the suitability and final approval of a suggested plastic material for its intended purpose is the responsibility of the customer, not the material supplier. (DX II 61 at 11.) FASCO and TCM had superior knowledge about the end use of the endframe, including its assembly. Phillips properly provided TCM with technical literature and material data sheets setting forth the relevant properties of R-4XT, from which TCM engineers could determine, based on their interaction with FASCO and their superior knowledge about the demands to be placed on the part, if the product was suitable. (DX II 84 & 85.) TCM sampled not only R-7 and R-4XT, but also Amodel and other non-Phillips plastics. (DX I 20; DX I 22; DX II 90 at ¶ 4.) Phillips cannot be held responsible for plaintiffs' informed choice. Second, there is no evidence that the R-4XT, if properly molded, would not have been suitable. In fact, Huron-molded parts were fully crystalline, (DX II 80), and were capable of withstanding the stress of assembly, (DX II 33 at 4). It was FASCO's opinion that with a few mold design changes and a modification of the crimping process, use of the R-4XT would result in acceptable, crack-free parts. (DX I 18 at 602-3.) TCM likewise believed that it could produce acceptable parts from R-4XT. (DX I 6 at 179; DX I 4 at 112-113.)

Phillips is not in the business of providing a part design service, but simply reviewed part drawings in this case when TCM asked it to do so. (DX II 61 at 10.)[29] TCM employees, Sharp and Mansell, acknowledged that they agreed with Phillips' comments regarding the part and mold design, that the suggestions were general in nature and nothing out of the ordinary, and that

---

[29] Beall, Phillips' expert witness, contends that Phillips was not under a duty to provide mold design services; rather, that it is the customer and not the material manufacturer that is responsible for designing a part. (DX II 61 at 10.)

if they had disagreed with a Phillips recommendation, they would not have followed it. (DX I 15 at 176-77, 448, 601-03; DX I 12 at 114-15, 252-53.) Even plaintiffs' expert agreed that Phillips' advice was appropriate except as to the choice of material.[30] (DX I at 226-27.)

It appears from the evidence that it was TCM's poor processing, not the R-4XT or Phillips' technical assistance, that caused the project to fail. FASCO employee Raloff's report of the March 3, 1997, meeting at TCM concluded that "TCM equipment and process parameters [were] not able to produce part[s] to acceptable Ryton material specs." (DX II 75 at 1.) Nowhere in Raloff's memo or in the subsequently issued 8-D Analysis was Phillips' technical assistance or material identified as a root cause of the project failure. (DX II 75; DX II 33.) The 8-D Analysis identified poor supplier molding practices and possibly the FASCO crimping process as the root cause of the cracking, not the material or Phillips. (DX II 33 at 2.) In FASCO's opinion, the "cracks [were] likely a direct result of process quality and not poor design." (DX I 18 at 588; DX I 2 at 109-10.) Huron's ability to mold a fully crystalline R-4XT endframe with a reduced number of voids that withstood crimping confirms that Phillips could not have been negligent in selling R-4XT for the project. (DX II 33 at 4.) The court concludes that there is no evidence on which a reasonable jury could find that Phillips was negligent in the manner in which it worked with TCM.[31] Summary judgment is due to be granted in favor of defendant on plaintiffs' negligence claim.

---

[30] Plaintiffs' expert was unable to articulate any specific disagreements that he may have had with the report of Phillips' expert regarding the manner in which Phillips assisted TCM. (DX I 16 at 146-47.)

[31] As discussed above, Phillips did not owe any independent duty to FASCO that could give rise to negligence liability. Moreover, the evidence confirms that any duty even arguably owed to FASCO was fully discharged through Phillips' appropriate interaction with TCM.

### 4.    *Plaintiffs cannot prove the elements of a breach of contract claim.*

In order to establish a breach of contract, plaintiffs[32] must demonstrate that: (i) a contract existed between Phillips and TCM, (ii) TCM performed its obligations under the contract, (iii) Phillips failed to perform under the contract, and (iv) such failure proximately caused damage to TCM. *See Southern Medical Health Sys., Inc. v. Vaughn*, 669 So. 2d 98, 99 (Ala. 1995). "Summary judgment is appropriate in a breach of contract action where the contract is unambiguous and the facts undisputed." *Gabrielson v. Healthcorp. of Eufala, Inc.*, 628 So. 2d 411, 415 (Ala. 1993). The undisputed evidence in this case establishes that Phillips fully performed its contractual obligations.

The only contract between Phillips and TCM is clear and unambiguous. The contract is premised on Phillips' agreement to sell, and TCM's agreement to purchase, certain quantities of R-4XT for a stated price. (DX II 90 Ex. E.) There is no evidence to suggest that Phillips did not sell and deliver the necessary quantities of R-4XT to TCM. In fact, plaintiffs have not even alleged that Phillips failed to sell and deliver the proper quantities of R-4XT at the agreed upon price, or that the R-4XT provided by Phillips failed to meet the contractual specifications. (DX I 18 at 376.)

---

[32]  It is well settled that one that is not a party to, or in privity with, a contract cannot sue for its breach. *See Twine v. Liberty Nat'l Life Ins. Co.,* 311 So. 2d 299, 205 (Ala. 1975); *Watson v. Mills,* 153 So. 2d 612, 613 (Ala. 1963). Under Alabama law, a direct third-party beneficiary may sue on the contract. *State Farm Fire & Cas. Co. v. Green,* 624 So. 2d 538, 539 (Ala. 1993). However, the party claiming to be a third-party beneficiary of a contract must establish that the contracting parties intended, at the time the contract was created, to bestow a direct benefit upon the third party. *Weathers Auto Glass, Inc. v. Alfa Mutual Ins. Co.,* 619 So. 2d 1328, 1329 (Ala. 1993). As noted above, it is undisputed that there was no direct contractual relationship between Phillips and FASCO nor is FASCO a third-party beneficiary of the contract between TCM and Phillips. FASCO cannot recover from Phillips for breach of a contract to which it was not a party.

Rather, plaintiffs' Complaint articulates a breach of contract claim based upon Phillips'

failure to perform duties not mentioned in the written contract. Plaintiffs claim that Phillips

breached its "contractual" duties to provide plastic engineering services, to provide design

engineering advice and services, and to provide technical advice, information, and assistance

regarding the injection molding process.[33] (DX I 1 at ¶ 45.) It is beyond dispute that the sales

contract, which contains a valid and enforceable merger clause, *see, e.g., Bussey v. John Deere

Co.,* 531 So. 2d 860, 862 (Ala. 1988), does not obligate Phillips to provide such services, which

are nowhere mentioned.

Plaintiffs argue in response that the contract under which they are suing "is not based on

their purchase of [R-4XT]," but is an alleged oral agreement whereby Phillips agreed to provide

the services referenced in the Complaint. (Pl.'s Brief at 15.) Plaintiffs have not provided any

evidence that an oral contract actually exists.[34] Further, labeling a contract "oral" does not

excuse plaintiffs from proving the formalities of a contract. Plaintiffs have not demonstrated

that, in the context of this alleged separate agreement for technical services, there was "an offer

and acceptance, consideration, and mutual assent to terms essential to the formation of a

contract." *Ex parte Grant*, 711 So. 2d 464, 465 (Ala. 1997). In fact, TCM's own witnesses

---

[33] Plaintiffs' breach of contract claim, as stated, is really its deficient negligence claim in a different guise: it is based on the same alleged failure to perform the same alleged duties. Unfortunately for plaintiffs, the facts are an even poorer fit for the contract claim, as the unambiguous written contract nowhere mentions the duties Phillips is claimed to have breached.

[34] Plaintiffs instead "support" their claim with comments such as, "[t]his is precisely the technical expertise and advice TCM and FASCO made an agreement to receive." (Pls.' Brief at 31.) Absent is any evidence that Phillips was asked, or agreed, to provide any particular assistance that was not rendered. (DX III 99 at 596; DX III 91 at 123-24.)

testified that they were not aware of or could not recall any contract or agreement with Phillips related to the provision of technical services.  (DX III 91 at 124; DX III 93 at 201-02.)

Even ignoring the lack of evidence of the requisite offer and acceptance, or of any terms for the alleged agreement, any such contract would necessarily fail for lack of consideration.  *See Ex parte Grant*, 711 So. 2d at 465.  "A test for good consideration for a contract is whether the promisee at the instance of the promisor has done, forborne or undertaken to do anything real, or whether he has suffered any detriment, or whether in return for the promise he has done something he was not bound to do, or has promised to do some act or to abstain from doing something."  *Id.*  The evidence before the court is that plaintiffs made no commitment to Phillips in connection with the use or purchase of R-4XT until TCM entered into the written contract dated November 1, 1996, committing Phillips to sell certain quantities of R-4XT to TCM at an agreed price over a one-year period.  (DX II 90 Ex. E.)  There is no evidence that Phillips ever requested or received any compensation for the services it provided.  There is no evidence of any consideration given by plaintiffs that could support a separate oral contract.

Plaintiffs' attempt to distinguish between the technical services provided by Phillips and the sale of R-4XT ignores the fact that the technical assistance provided by Phillips related directly to the sale of R-4XT and its use in the endframe application.  Any technical assistance provided was merely in support of the sale of R-4XT under the written contract and does not give rise to a second "contract." [35]  The relative duties of Phillips and TCM regarding the sale are

---

[35]  The written contract states that it "constitutes the entire agreement between the parties hereto regarding the sale and purchase of [R-4XT], and no prior Letter of Agreement, promises, or agreements written or oral, shall be of any force or effect from and after the effective date hereof [November 1, 1996] unless otherwise embodied herein."  (DX II 90 Ex. E.)  Nowhere does the written contract bind Phillips to provide any kind or amount of technical assistance to plaintiffs

outlined within the four corners of the written contract. Plaintiffs have not disputed that Phillips

performed its duties under the contract by selling and delivering the necessary quantities of R-

4XT meeting all product specifications to TCM at the stated price. Because the contract is

unambiguous, and because there is no evidence in this case indicating that Phillips breached its

contract with TCM, summary judgment for Phillips is appropriate. *See Gabrielson*, 628 So. 2d at

415. ("Summary judgment is appropriate in a breach of contract action where the contract is

unambiguous and the facts undisputed.").

## IV. CONCLUSION

Based on the foregoing, the court is of the opinion that the Motion for Summary

Judgment filed by defendant is due to be granted. An Order in accordance with this

Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this  28th day of September, 2001.

Sharon Lovelace Blackburn

**SHARON LOVELACE BLACKBURN**
United States District Judge

_____

related to their use of R-4XT.

-64-